Joseph E. Addiego III (CA State Bar No. 169522)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Telephone:    (415) 276-6500
Facsimile:    (415) 276-6599
Email:    joeaddiego@dwt.com

Stephen M. Rummage (Admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA  98101-3045
Telephone:    (206) 662-3150
Fax:    (206) 757-7700
E-mail:    steverummage@dwt.com

SCOTT R. COMMERSON (CA State Bar No. 227460)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa St., Suite 2400
Los Angeles, California 900017
Telephone:    (213) 633-6890
Fax:    (213) 633-4290
Email:    scottcommerson@dwt.com

Attorneys for Defendant
SPOTIFY USA, INC.

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY INGALLS and TONY HONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SPOTIFY USA, INC., a Delaware corporation; and DOES 1 – 10, inclusive,<br><br>Defendants. | Case No. 3:16-cv-3533 WHA<br><br>**DECLARATION OF JOHN BROPHY IN SUPPORT OF SPOTIFY USA INC.'S MOTION TO COMPEL ARBITRATION AND TO STAY ACTION**<br><br>[Assigned to the Hon. William H. Alsup]<br><br>Date: September 29, 2016<br>Time: 8:00 a.m.<br>Judge: Hon. William H. Alsup<br>Courtroom 8 – 19th Floor |

# DECLARATION OF JOHN BROPHY

I, John Brophy, declare as follows:

1. **Qualifications of Declarant.** I am an employee of Spotify USA Inc. ("Spotify"), where I have been employed since May 2012. From December 2010 through May 2012, I worked for Spotify Ltd. in London. I am currently a Product Owner working with Spotify's web development teams. My employment responsibilities include creation and oversight of the roadmap for the web team, and collaboration with design teams to develop new plans for the web site. My job regularly entails analyzing the performance and functionality of Spotify's public-facing web properties.

2. **Personal Knowledge.** I work with Spotify's website on a day-to-day basis as part of my job. I am a custodian of documents relating to Spotify's website, including various versions of the pages that make up Spotify's website. This declaration is based on my personal knowledge and on records maintained by Spotify in the ordinary course of business, on which Spotify and I rely in the ordinary course of business.

3. **The Spotify Service.** Spotify is an online service that allows users to search and stream music. Certain free services are available to Spotify users, but to listen to music while off-line or to access the full Spotify functionality on devices other than a computer, including phones and tablets, users generally must pay a monthly fee for Spotify's Premium service.

4. **Plaintiffs' Complaint.** I understand that this lawsuit relates to automatically recurring payments of Spotify subscribers in the United States who purchased a Premium Subscription Service through spotify.com since June 23, 2012.

5. **Records and Materials Reviewed.** I have reviewed records showing the activity of Spotify subscribers Gregory Ingalls and Tony Hong, as well as records demonstrating the look and functionality of Spotify's website during the time period when Ingalls and Hong subscribed to Spotify's free services and Premium services. These records were generated by queries to Spotify application logs and data sources, which contain data regarding individual Spotify users, as well as queries to Spotify's revision control system, which contains versions of and changes to Spotify's

1

DECLARATION OF JOHN BROPHY
Case No. 3:16-cv-3533 WHA
DWT 30218558v1 0098755-000014

website. I have also reviewed and am familiar with the Declaration of James Whitehead ("Whitehead Declaration"), which I understand will be filed along with this Declaration in support of Spotify's Motion to Compel Arbitration. While Mr. Whitehead's declaration focuses primarily on Spotify's process for enrolling users and obtaining payment for Spotify's paid Premium subscriptions, my declaration will focus on the user experience in signing up for Spotify services generally.

**Plaintiff Gregory Ingalls.**

6.  **Mr. Ingalls Accepted Spotify's Terms and Conditions When He Registered for Spotify's Free Service.** Spotify users must register to use any Spotify service, including the free service. To register, users currently may (a) download the Spotify application on an Apple, Android, or Windows mobile phone or tablet or on a Sony Playstation (the "Spotify app") or (b) go to www.spotify.com using a web browser on a computer, tablet, or mobile phone. Spotify's records establish that Mr. Ingalls signed up for Spotify's free service on November 21, 2012, using a desktop[1] computer and his Facebook account, but they do not establish which specific buttons Mr. Ingalls pushed to complete the sign-up process. Spotify's records establish that Mr. Ingalls could have registered for Spotify in one of three ways—but every one of these three methods required Mr. Ingalls to accept Spotify's Terms and Conditions of Use ("Terms and Conditions"):

   A.  *First*, Mr. Ingalls could select the "Get Spotify for free" button on Spotify.com. Below the "Get Spotify for free" button, the screen notified users that "By using Spotify, you agree to our **terms & conditions** and **privacy policy**." The phrases "terms & conditions" and "privacy policy" are both hyperlinks, and clicking on the links led a user to Spotify's Terms and Conditions and Privacy Policy, respectively. On this page, a user would register a new account by clicking on the "Get Spotify for free" button immediately above this notice of acceptance of the Terms and Conditions. I am attaching as **Exhibit 1** a screen capture of the Spotify.com page with the "Get Spotify for free" button. After the user clicks the "Get Spotify for free" button, a screen then appeared thanking the user for

---
[1] "Desktop" as used in this declaration also includes laptop.

2

DECLARATION OF JOHN BROPHY
Case No. 3:16-cv-3533 WHA
DWT 30218558v1 0098755-000014

downloading Spotify. I am attaching as **Exhibit 2** a screen capture of this page. Once the Spotify desktop application was installed, the user then could login with an email address associated with the user's Facebook account. I am attaching as **Exhibit 3** a screen capture of this login screen. If Mr. Ingalls registered this way, he would have input his Facebook user name and password in the appropriate field and selected "Log In." Then, he would have reached a screen informing him that the application would receive his email address and birth date from Facebook. He could click "Okay, Listen to Music" to start streaming music. I am attaching as **Exhibit 4** a screen capture of that page.

B.  *Second*, desktop users such as Mr. Ingalls could register through Facebook with the Spotify web player, which allowed users to stream music through their internet browser. Spotify allowed users to post their streaming activity in their Facebook feeds. I am attaching as **Exhibit 5** an example mockup of user streaming activity in a Facebook feed. If a Facebook user clicked on the play button on a friend's user activity, a sign-up landing page would appear. The page included a description of the Spotify service, and explained the information Spotify would receive from the user's Facebook account. The page also informed users, at the bottom of the screen, that "[b]y proceeding, you agree to Spotify's **Terms of Service** and **Privacy Policy**." The phrases "Terms of Service" and "Privacy Policy" were hyperlinks that led a user to Spotify's Terms and Conditions and Privacy Policy, respectively. Users had the option to click one of two buttons on the page: "Okay, Listen to Music" or "Close." A user such as Mr. Ingalls could not have signed up for the Spotify service using this method without selecting the "Okay, Listen to Music" button. I am attaching as **Exhibit 6** a screen capture of the page that Mr. Ingalls would have seen if he had registered in this manner. Once the user clicked "Okay, Listen to Music," he could commence streaming music using the web player, without any charge.

C.  *Third*, desktop users could register for Spotify through Facebook by accessing a promotion within Facebook and downloading the Spotify application. Facebook promoted Spotify in links that appeared on the right side of users' Facebook feeds. In the mockup of a user's Facebook feed in Exhibit 5, there is an example of such a Spotify advertisement on

3

the right side of the page under "Featured music service." A user could click on a button in the advertisement that said "Start Listening" or "Open Spotify." I am attaching as **Exhibit 7** a screen capture of an "Open Spotify" advertisement, which would have appeared on the right side of users' Facebook feeds, similar to the placement of the advertisement under "Featured Music Services" in Exhibit 4. If the user clicked on the button in the advertisement that said "Open Spotify," the user reached a pop-up screen where the user could log in to Spotify using his Facebook user name and password. I am attaching as **Exhibit 8** a copy of that pop-up screen. Upon logging in, the user would reach a registration form in which the user's name, email address, gender, and birthday were pre-filled with information from the user's Facebook account. The registration form also included a box, which a user could check or uncheck, next to the statement "I agree with the Spotify end user agreement.*" The corresponding asterisk at the bottom of the page states: "* View the **Spotify terms and conditions of use** and **Privacy policy**." The phrases "Spotify's terms and conditions of use" and "Privacy policy" are hyperlinks that led a user to Spotify's Terms and Conditions and Privacy Policy, respectively. The registration box also has links to the **"Terms of Service"** and **"Privacy Policy"** below the "Register" button, and these terms are also hyperlinks leading to the Terms and Conditions and Privacy Policy, respectively. I am attaching as **Exhibit 9** a copy of the registration form that a user would have seen if using this third registration method. To proceed to the next page, the user had to click "Register." After clicking "Register," the user reached a page where he could complete the registration by selecting between the free Spotify service, the unlimited service for $4.99 per month, or the Premium service for $9.99 per month. If Mr. Ingalls used this method to register for the free Spotify service in November 2011, he selected the box for the free Spotify service and then clicked the "Download" button at the bottom of the page. I am attaching as **Exhibit 10** a screen capture of that page.

In summary, Mr. Ingalls was required to accept Spotify's Terms and Conditions in all three of the possible ways that he could have registered for the free service in November 2012.

4

DAVIS WRIGHT TREMAINE LLP

7. **Mr. Ingalls Accepted Spotify's Terms and Conditions Again When He Subscribed to Spotify's Premium Service.** On June 8, 2013, Mr. Ingalls contracted for the Spotify Premium streaming music service, registering for a 30-day free trial. When registering, he reached a screen allowing him to select either an "unlimited" plan for $4.99/month or the "premium" plan for $9.99/month. He selected the "Premium" plan by clicking "Try Premium." I am attaching as **Exhibit 11** a screen capture of this page. When a user selects "Try Premium," as Mr. Ingalls did, the website asks the user to log in to an existing Spotify account or to create a new account. Existing Spotify users (who have already agreed to Spotify's Terms and Conditions) may log in at this screen; new users must select "Sign up" at the bottom of the log-in box to create a new account. Mr. Ingalls logged in, then selected a method of payment for Spotify Premium; in addition, although Mr. Ingalls had already accepted Spotify's Terms and Conditions when signing up for the free service, he again acknowledged Spotify's Terms and Conditions in connection with his subscription to Spotify Premium, and he received two receipts confirming his purchase, as described in the Whitehead Declaration at ¶¶ 7-8.

8. **Mr. Ingalls Accepted Spotify's Updated Terms and Conditions in January 2016.** Mr. Ingalls cancelled his Premium subscription in 2013, as explained in the Whitehead Declaration, but he has continued to use Spotify's free service. On September 9, 2015, Spotify updated its Terms and Conditions and required all users to accept the new terms in order to continue using the service. Users of the free service who opened the Spotify application or web-based player after September 9, 2015, as Mr. Ingalls did, were presented with this message: "**Updated terms.** We have revised our **Terms and Conditions of Use** and our **Privacy Policy**. By continuing to use Spotify, you accept these updated terms, so please take a few minutes to read and understand them." The phrases "Terms and Conditions of Use" and "Privacy Policy" were hyperlinks that led the user to Spotify's Terms and Conditions and Privacy Policy, respectively. To continue using the free service after September 9, 2015, users of the free service were required to accept the updated terms by clicking "Accept." I am attaching as **Exhibit 12** a screen capture of the message as Mr. Ingalls would have seen it. Spotify's records establish that Mr. Ingalls clicked "Accept" to the updated terms on January 7, 2016, which Spotify's records indicate was

5

the first occasion when Mr. Ingalls attempted to stream music from Spotify after the Terms and Conditions were updated, effective on September 9, 2015.

**Plaintiff Tony Hong.**

9.  **Mr. Hong Accepted Spotify's Terms and Conditions When He Registered for Spotify's Free Service.** Spotify's records establish that Mr. Hong registered for Spotify's free service on November 21, 2011, using a desktop computer and a Facebook account. (On July 20, 2011, he had separately registered using an email address, but did not use that account for any of the further activity described in this declaration.) Spotify's records establish that, like Mr. Ingalls, Mr. Hong would have registered in one of the three ways described in paragraph 6, above, each of which required Mr. Hong to accept Spotify's Terms and Conditions to complete the registration.

10. **Mr. Hong Signed Up for a Premium Subscription Through a Promotion, And Accepted the Terms and Conditions Again.** Spotify's records establish that on December 29, 2014, Mr. Hong signed up for Spotify's 3-months-for-$.99 offer, using his Facebook-created account. I am attaching as **Exhibit 13** a screen capture of the landing page Mr. Hong would have seen. Mr. Hong clicked on "Upgrade Now," and then selected a method of payment, agreed again to Spotify's Terms and Conditions, and received two receipts confirming his purchase, as set forth in the Whitehead Declaration at ¶ 10. On March 29, 2015, the three-month promotional term ended, and Mr. Hong's account converted to a regular Premium subscription. He was charged for one month of Premium at $9.99 on that date. Mr. Hong cancelled his Premium subscription two days later, on March 31, 2015. Because he had already paid for one month of Premium, he continued to have access to Premium functionality through April 28, 2015.

11. **Mr. Hong Accepted the Terms and Conditions Again When He Registered for Spotify Premium a Second Time.** On May 6, 2015, Mr. Hong registered for the Spotify Premium service a second time. I am attaching a screen capture of that page as **Exhibit 14**. Mr. Hong clicked on the "Go Premium" button on Spotify's Web site. He then reached a page with the options to "Log in with Facebook" or "Log In" using his user name and password. Below the "Log in" button, the page states: "If you click 'Log in with Facebook' and are not a Spotify user, you will be registered and you agree to **Spotify's Terms & Conditions and Privacy Policy**." The

6

DECLARATION OF JOHN BROPHY
Case No. 3:16-cv-3533 WHA
DWT 30218558v1 0098755-000014

terms. "Spotify's Terms & Conditions" and "Privacy Policy" are hyperlinked. I am attaching as **Exhibit 15** a screen capture of the page. As set forth in the Whitehead Declaration at ¶¶ 10-11, after Mr. Hong logged in, he selected a method of payment for Spotify Premium, acknowledged his acceptance of the Terms and Conditions again, and received two receipts confirming his purchase.

12. **Mr. Hong Accepted Spotify's Updated Terms and Conditions in September 2015.** Mr. Hong was still an active Premium subscriber on September 9, 2015, when Spotify updated its Terms and Conditions and Privacy Policy. Starting on September 9, 2015, a pop up screen appeared in the Spotify Premium desktop player whenever a Premium subscriber, such as Mr. Hong, attempted to use the player. The screen stated: "**UPDATED TERMS.** We have revised our **Terms and Conditions of Use** and **Privacy Policy**." The terms "Terms and Conditions of Use" and "Privacy Policy" were hyperlinks that led a user to Spotify's Terms and Conditions and Privacy Policy, respectively. Spotify Premium users such as Mr. Hong were given the option to press buttons for "Accept" or "Not Now." I am attaching as **Exhibit 16** a screen capture of the message as Mr. Hong saw it. Clicking "Not Now" brought up a new message screen, attached as **Exhibit 17**, informing the user that: "You may continue to use Spotify for 30 days without accepting the updated Terms and Conditions and Privacy Policy. If you do not accept the new terms by that time, you will no longer be able to use Spotify." Spotify Premium users who clicked "Not Now" were allowed to keep using the service, but for the next 30 days the user was prompted with the exact same request each time the user logged in, accompanied by a countdown clock telling them how many days they had left to decide. If, by the thirtieth day, the users still had not accepted the Terms and Conditions, then their choices were either to "Accept" or close the application. To continue using the Spotify application after the thirtieth day, users were required to click "Accept" to the updated terms. Spotify's records establish that Mr. Hong clicked "Accept" to the updated Terms and Conditions on September 12, 2015, within days after they were made available.

13. **Mr. Hong Re-subscribed to Spotify Premium a Third Time.** Mr. Hong continued using his Premium subscription until June 28, 2016, when he cancelled. Four days

7

later, on July 2, 2016, Hong resubscribed to Premium yet again, as set forth in the Whitehead Declaration, ¶ 12.

14. **Spotify's U.S. Terms and Conditions.** I am attaching as **Exhibit 18** a true and correct copy of Spotify's current U.S. Terms and Conditions, effective September 9, 2015. From July 2011 through the present, the then-current versions of Spotify's U.S. Terms and Conditions have been available on Spotify's website, www.spotify.com, and have been accessible by several paths, including by following the Legal link in the bottom left corner of the web page.

15. **Arbitration Provision.** Immediately below the table of contents of the Terms and Conditions, Spotify explains the document "is important and affects your legal rights, so please read [it] and our Privacy Policy and other terms referenced in this document carefully." The fourth paragraph in the Introduction begins with the words, in bold, "**Please read the Agreements carefully.**" That paragraph continues to say the Agreements (defined to include the Terms and Conditions) "include information about ... a class action waiver, and resolution of disputes by arbitration instead of in court." The words "class action waiver" and "resolution of disputes by arbitration" are hyperlinks that take the reader directly to those provisions. Further, the table of contents also links to Spotify's arbitration provision, identified as "24. Choice of law, mandatory arbitration and venue." Subscribers may also reach this provision by scrolling through the Terms and Conditions. Section 24.3.1 provides:

> You and Spotify agree that any dispute, claim, or controversy between you and Spotify arising in connection with or relating in any way to these Agreements or to your relationship with Spotify as a user of the Service (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of the Agreements) will be determined by mandatory binding individual arbitration. Arbitration is more informal than a lawsuit in court. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED. There may be more limited discovery than in court. The arbitrator must follow this agreement and can award the same damages and relief as a court (including attorney fees), except that the arbitrator may not award declaratory or injunctive relief benefiting anyone but the parties to the arbitration. This arbitration provision will survive termination of the Agreements.

8

16.     **Class Action Waiver.** The Terms and Conditions also contain an express class action waiver at Section 24.2:

> WHERE PERMITTED UNDER THE APPLICABLE LAW, YOU AND SPOTIFY AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION. Unless both you and Spotify agree, no arbitrator or judge may consolidate more than one person's claims or otherwise preside over any form of a representative or class proceeding.

17.     **Prior Versions of Spotify's Terms and Conditions.** Spotify made various updates to its Terms and Conditions between July 14, 2011, and September 9, 2015, when the current version was issued. Since October 14, 2011, the Terms and Conditions have had an arbitration provision and class action waiver. I am attaching together as **Exhibit 19** true and correct copies of prior versions of the Terms and Conditions since October 14, 2011.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed this 22nd day of August 2016, in New York, New York.

_____
John Brophy

DECLARATION OF JOHN BROPHY
Case No. 3:16-cv-3533 WHA
DWT 30218558v1 0098755-000014