Joseph E. Addiego III (CA State Bar No. 169522)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111
Telephone:     (415) 276-6500
Facsimile:      (415) 276-6599
Email:           joeaddiego@dwt.com

Stephen M. Rummage (Admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, Washington  98101-3045
Telephone:     (206) 662-3150
Fax:             (206) 757-7700
E-mail:          steverummage@dwt.com

Scott R. Commerson (CA State Bar No. 227460)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa St., Suite 2400
Los Angeles, California 900017
Telephone:     (213) 633-6890
Fax:             (213) 633-4290
Email:           scottcommerson@dwt.com

Attorneys for Defendant
SPOTIFY USA INC.

DAVIS WRIGHT TREMAINE LLP

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY INGALLS and TONY HONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SPOTIFY USA, INC., a Delaware corporation; and DOES 1 – 10, inclusive,<br><br>Defendants. | Case No. 3:16-cv-3533 WHA<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEFENDANT SPOTIFY USA INC.'S NOTICE OF MOTION AND MOTION OF DEFENDANT FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Assigned to the Hon. William H. Alsup]<br><br>Date:  July 13, 2017<br>Time:  8:00 a.m.<br>Judge: Hon. William H. Alsup<br>Courtroom 8 – 19th Floor |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

NOTICE IS HEREBY GIVEN that, pursuant to Federal Rule of Civil Procedure 56 and Rule 56-1 of the Local Rules for the United States District Court for the Northern District of California, on July 13, 2017 at 8:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable William H. Alsup, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Spotify USA Inc. will move for summary judgment in its favor on each of the causes of action alleged against it in the First Amended Complaint ("FAC") of plaintiffs Gregory Ingalls and Tony Hong.

Spotify is entitled to judgment as a matter of law for these reasons:

1.      Spotify is entitled to judgment as a matter of law because plaintiffs suffered no damage or loss as a result of any disclosures at issue.  Plaintiffs therefore lack standing under the Unfair Competition Law ("UCL") (Business & Professions Code § 17200) and Article III of the United States Constitution.  Further, even if a private right of action exists under California's Automatic Purchase Renewal Law ("APRL") (Business & Professions Code §§ 17600-17604)— which it does not, as explained below—they lack standing to bring it.

2.      Spotify is also entitled to judgment as a matter of law on plaintiffs' First Cause of Action alleging violations of the APRL because that statute does not confer a private right of action.  Although plaintiffs may allege a violation of the APRL as a predicate for a claim under California's UCL, they cannot assert a violation of the APRL as an independent cause of action.

3.      Plaintiffs also lack standing to seek injunctive relief.  Because plaintiffs admit they are aware of Spotify's auto-renew policy and how to cancel their Premium subscription in the future, plaintiffs face no imminent injury, as Article III requires for standing to seek injunctive relief.

This Motion is based upon this Notice; the attached Memorandum of Points and Authorities; the concurrently filed Declarations of James Whitehead[1] and Scott R. Commerson, with corresponding exhibits; any matters of which this Court may take judicial notice; all

---

[1] Spotify previously submitted the Declaration of James Whitehead on August 22, 2016. Dkt. No. 20.  For the convenience of the court, Spotify has refiled this declaration with this Motion.

1   pleadings, files, and records in this action; and such other argument and evidence as may be

2   presented to the Court at or before the time of the hearing on this Motion.

3

4   DATED: June 1, 2017                          Respectfully submitted,

5                                                DAVIS WRIGHT TREMAINE LLP
                                                 Joseph E. Addiego III
6                                                Stephen M. Rummage
                                                 Scott R. Commerson
7

8                                                By:   _/s/ Joseph E. Addiego III_____
                                                        Joseph E. Addiego III
9
                                                 Attorneys for Defendant
10                                               SPOTIFY USA INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

MOTION FOR SUMMARY JUDGMENT
Case No. 3:16-cv-3533 WHA
NG-S40TG52V 4833-1069-5241v.3 0098755-000014

DAVIS WRIGHT TREMAINE LLP

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................................ 1

II.  ISSUES TO BE DECIDED ................................................................................................ 2

III.  STATEMENT OF FACTS ................................................................................................. 2

    A.  Plaintiffs' Allegations. ............................................................................................. 2

    B.  Plaintiffs' Purchases of Spotify Services. ............................................................... 3

        1.  Gregory Ingalls. ........................................................................................... 3

        2.  Tony Hong. ................................................................................................... 6

IV.  ARGUMENT FOR SUMMARY JUDGMENT ................................................................. 9

    A.  Because Plaintiffs Cannot Show Injury from the Technical APRL Violations They Allege, They Lack Both Statutory and Constitutional Standing to Pursue Their Claims. ....................................................................................... 10

        1.  Plaintiffs Could Not Have Been Injured by Allegedly Defective Disclosures They Did Not Read. .................................................................. 11

        2.  Plaintiffs Suffered No Injury in Fact Because They Admit They Used the Premium Service, and Were Able to Cancel When They No Longer Wanted It. ..................................................................................... 14

    B.  Plaintiffs' Cause of Action for Alleged Violation of the APRL Fails Because the APRL Does Not Confer a Private Right of Action. ........................................... 17

    C.  Plaintiffs Lack Standing to Seek Injunctive Relief. .............................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................................10

*Backhaut v. Apple, Inc.*,
    74 F. Supp. 3d 1033 (N.D. Cal. 2014) ......................................................................13

*Baggett v. Hewlett-Packard Co.*,
    2009 WL 3178066 (C.D. Cal. Sept. 29, 2009) ..........................................................16

*Bates v. United Parcel Serv.*,
    511 F.3d 974 (9th Cir. 2007) ....................................................................................18

*Baxter v. Intelius, Inc.*,
    2010 U.S. Dist. LEXIS 104218 (C.D. Cal. Sept. 16, 2010) .......................................14

*Becker v. Skype Inc.*,
    2014 WL 556697 (N.D. Cal. Feb. 10, 2014) .............................................................19

*Californians for Disability Rights v. Mervyn's, LLC*,
    39 Cal. 4th 223 (2006) ..............................................................................................10

*Castagnola v. Hewlett-Packard Co.*,
    2012 WL 2159385 (N.D. Cal. June 13, 2012) ...........................................................19

*Cattie v. Wal-Mart Stores, Inc.*,
    504 F. Supp. 2d 939 (S.D. Cal. 2007) .......................................................................14

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ....................................................................................................9

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ....................................................................................................19

*Cullen v. Netflix, Inc.*,
    2013 U.S. Dist. LEXIS 4246 (N.D. Cal. Jan. 10, 2013) ............................................14

*Daro v. Superior Court*,
    151 Cal. App. 4th 1079 (2007) ............................................................................11, 14

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ...................................................................................14

*Durell v. Sharp Healthcare*,
    183 Cal. App. 4th 1350 (2010) ..................................................................................13

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

*Hall v. Time Inc.*,
158 Cal. App. 4th 847 (2008).................................................................10, 11, 16

*Huck v. Kone Inc.*,
2011 WL 6294466 (N.D. Cal. Dec. 15, 2011) ...........................................10

*In re Brazier Forest Prods., Inc.*,
921 F.2d 221 (9th Cir. 1990)......................................................................9

*In re Intel Laptop Battery Litig.*,
2011 WL 7290487 (N.D. Cal. Apr. 7, 2011) ...........................................19

*In re iPhone Application Litig.*,
6 F. Supp. 3d 1004 (N.D. Cal. 2013) .......................................................14

*Johnson v. Pluralsight, LLC*,
2017 U.S. Dist. LEXIS 23294 (E.D. Cal. Feb. 17, 2017) ....................17, 18

*Johnson v. Pluralsight, LLC*,
2017 WL 661953 (E.D. Cal. Feb. 17, 2017) ..........................................17, 18

*Kissel v. Code 42 Software, Inc.*,
2016 U.S. Dist. LEXIS 184368 (C.D. Cal. Apr. 14, 2016) ......................18

*Kissel v. Omega Natural Sci., Inc.*,
2016 WL 9019613 (C.D. Cal. Aug. 22, 2016) .....................................13, 15

*Laster v. T-Mobile USA, Inc.*,
407 F. Supp. 2d 1181 (S.D. Cal. 2005) ...................................................14

*Law Offices of Mathew Higbee v. Expungement Assistance Servs.*,
214 Cal. App. 4th 544 (2013)...................................................................10

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................11, 20

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .................................................................................10

*Luman v. Theismann*,
647 Fed. App'x 804 (9th Cir. 2016)..........................................................19

*Mayron v. Google, Inc.*,
2016 Cal. Super. LEXIS 173 (Feb. 26, 2016) .....................................16, 17

*Mayron v. Google, Inc.*,
2016 WL 1059373 (Cal. Super. Feb. 6, 2016) .....................................15, 18

*Perez v. Nidek Co.*,
711 F.3d 1109 (9th Cir. 2013)..................................................................19

v

DAVIS WRIGHT TREMAINE LLP

*Peterson v. Cellco P'ship*,
    164 Cal. App. 4th 1583 (2008) .................................................................13

*Roz v. Nestle Waters N. Am., Inc.*,
    2017 WL 132853 (C.D. Cal. Jan. 11, 2017).....................................17, 18

*Siciliano v. Apple, Inc.*,
    2016 Cal. Super. LEXIS 1099 (Cal. Super. Ct. May 16, 2016) ................18

*Sierra E. Television, Inc. v. Westar Cable Television, Inc.*,
    776 F. Supp. 1405 (E.D. Cal. 1991) ........................................................17

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .............................................................................11

*Turcios v. Carma Labs, Inc.*,
    296 F.R.D. 638 (C.D. Cal. 2014) ............................................................12

*Warner v. Tinder, Inc.*,
    105 F. Supp. 3d 1083 (C.D. Cal. 2015)..............................................14, 15

**Statutes**

Bus. & Prof. Code
    § 17204 ....................................................................................................10
    §§ 17600-17606................................................................................................2
    § 17602 ....................................................................................................11
    § 17603 ...............................................................................................16, 17
    § 17604 ....................................................................................................17

**Rules**

Federal Rule of Civil Procedure
    56..............................................................................................................10
    56(a) ........................................................................................................10
    56(c) ..........................................................................................................9
    56(c)(1)(B) ................................................................................................9

**Constitutional Provisions**

U.S. Constitution Article III ..............................................................1, 11, 18, 20

MOTION FOR SUMMARY JUDGMENT
Case No. 3:16-cv-3533 WHA
NG-S40TG52V 4833-1069-5241v.3 0098755-000014

**DAVIS WRIGHT TREMAINE LLP**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Spotify offers a premium music streaming subscription ("Spotify Premium") that provides uninterrupted service in exchange for recurring payments, i.e., the service auto-renews on a monthly basis and continues until the user cancels.  Plaintiffs Gregory Ingalls and Tony Hong willingly bought subscriptions for Spotify Premium.  The online pages they saw clearly disclose the auto-renewal feature—including in text immediately above the button they each pressed to confirm payment and complete the subscription.  Nonetheless, Ingalls and Hong claim certain aspects of this routine online commercial transaction violate the California statute specifying disclosure requirements for auto-renewals.  This motion does not address the technical compliance of Spotify's disclosures—which in fact followed the statute.  Instead, Spotify moves for summary judgment because Ingalls' and Hong's claims fail as a matter of law without regard to whether Spotify complied with the statute in every particular.  The Court should dismiss their claims for the following reasons:

*First*, plaintiffs lack both constitutional standing under Article III and statutory standing under the Unfair Competition Law ("UCL") (Business  & Professions Code § 17200) because they suffered no damage or loss as a result of any purported failures by Spotify to comply with California's Automatic Purchase Renewal Law ("APRL") (Business  & Professions Code §§ 17600-17604).[2]  They admit they did not bother to read the disclosures prominently displayed on the sign-up page for Spotify Premium, and now acknowledge the disclosures made clear they were signing up for an automatically renewing service.  Given that, plaintiffs could not be injured as a matter of law by alleged technical defects or omissions in disclosures they never bothered to read.  Further, plaintiffs received the benefit of the bargain, and both easily canceled when they no longer wanted the service.  Indeed, Mr. Hong admitted he canceled and ***re-subscribed*** to the service on multiple occasions.

---

[2] For the same reason, assuming *arguendo* the APRL affords a private right of action—which it does not, as explained below—plaintiffs likewise lack standing to bring a claim under that statute.

1

*Second*, plaintiffs' independent cause of action for violation of the APRL fails because the APRL does not confer a private right of action.  Although a person may allege violation of the APRL as a predicate for a claim under other statutes, such as the UCL, the APRL does not afford any basis for an independent claim.

*Third*, even if plaintiffs had standing to pursue a claim for damages, they lack standing to seek injunctive relief.  Because plaintiffs are well aware of Spotify's auto-renew policy and how to cancel a Spotify Premium subscription, they face no imminent injury sufficient to confer standing to seek injunctive relief.

Accordingly, the Court should grant summary judgment in favor of Spotify on both of plaintiffs' causes of action.

## II.      ISSUES TO BE DECIDED

1.      Do plaintiffs lack standing to bring their claims for monetary relief?

2.      Does the APRL confer a private cause of action?

3.      Do plaintiffs lack standing to seek injunctive relief?

## III.      STATEMENT OF FACTS

### A.      Plaintiffs' Allegations.

Plaintiffs allege Spotify's offering of its Premium subscription streaming service to certain customers violates the APRL, Bus. & Prof. Code §§ 17600-17606.  In particular, they contend Spotify failed to follow the statute in disclosing auto-renewal terms to plaintiffs, and charged plaintiffs' credit cards without first obtaining plaintiffs' affirmative consent. *Id.* ¶¶ 37, 39, 42, 44.  In the Amended Complaint, plaintiffs seek to represent a putative class of "[a]ll natural persons in the United States who, since June 23, 2012, purchased a Premium Subscription Service through spotify.com." *Id.* ¶ 45.  They assert two subclasses consisting of "[a]ll natural persons in the Class who purchased a Premium Subscription Service through spotify.com in connection with a free trial period" and "[a]ll natural persons in the Class who purchased a Premium Subscription Service through spotify.com with no free trial period."[3] *Id.*  Plaintiffs seek restitution, damages,

---

[3] In Mr. Ingalls' Motion for Class Certification, he has narrowed the proposed class to California users who "signed up for Spotify Premium on spotify.com through either a '3 months  for a reduced price' or '30-day free trial' offer, selected a credit or debit card payment method, and

MOTION FOR SUMMARY JUDGMENT
Case No. 3:16-cv-3533 WHA
NG-S40TG52V 4833-1069-5241v.3 0098755-000014

DAVIS WRIGHT TREMAINE LLP

penalties, injunctive relief, and attorneys' fees and costs under the UCL. *Id.* ¶¶ 7, 75.[4]

### B. Plaintiffs' Purchases of Spotify Services.

#### 1. Gregory Ingalls.

Plaintiff Gregory Ingalls, a California resident, originally registered for Spotify's free streaming service using his Facebook account on November 21, 2012. Whitehead Decl. ¶ 6. Subsequently, Mr. Ingalls decided to upgrade his free account to the Spotify Premium service, which offered additional features, including the ability to listen to music without commercial interruption. Mr. Ingalls took advantage of a standard new user offer of a 30-day free Premium trial. He encountered a series of Web pages and disclosures in the process:

**Plan Selection Page.** On June 8, 2013, Mr. Ingalls contracted for the Spotify Premium streaming music service, registering for a 30-day free trial. Ingalls Depo. 77:9-12, Commerson Decl. Ex. 3. When registering, he had a choice of either an "Unlimited" plan for $4.99/month or the "Premium" plan for "$9.99 a month." He expressly selected the "Premium" plan for $9.99/month by clicking "Try Premium." Commerson Decl. Ex. 3, 102:3-17; Commerson Decl. Ex. 4.

**Payment Selection Page.** When Mr. Ingalls selected "Try Premium," the website asked him to log in to an existing Spotify account or to create a new account. *See* Commerson Decl. Ex. 3, 102:3-17. Existing Spotify users like Mr. Ingalls could log in at this screen. After logging in, Mr. Ingalls reached a screen allowing him to select a method of payment for Spotify Premium. Whitehead Decl. ¶ 7, Ex. 1; Commerson Decl. Ex. 3, 103:23-105:14; Commerson Decl. Ex. 5. That screen explained that "[i]f you don't wish to continue enjoying Spotify Premium after your trial, simply cancel before the trial ends and no charges will apply."

---

whose credit or debit card was subsequently charged $9.99 after the expiration of the offer term," and a subclass of users who "signed up for Spotify Premium on spotify.com through either a '3 months for a reduced price' or '30-day free trial' offer, selected a credit or debit card payment method, and whose credit or debit card was subsequently charged $9.99 at least twice after the expiration of the offer term, who subsequently cancelled their subscription." *See* Dkt. No. 76 at 1.

[4] Plaintiffs also sought a declaratory judgment that the arbitration clause and class action waiver in Spotify's Terms and Conditions are invalid, inapplicable, or unconscionable. FAC ¶ 83. The parties, however, have stipulated that, "in light of the Court's November 14, 2016 Order denying Spotify's Motion to Compel Arbitration, no further response [is required] to Count III of the First Amended Complaint." Dkt. No. 41. Spotify has appealed the Court's Order declining to enforce the arbitration clause. Dkt. No. 44.

3

*Id.* Mr. Ingalls does not remember this language, but admitted that he likely chose not to read it. Commerson Decl. Ex. 3, 104:2-106:7.

**Offer Terms & Conditions.** The payment selection page Mr. Ingalls viewed also contained a hyperlink bearing the phrase "Learn more" in highlighted blue text. When clicked, this link took subscribers to Spotify's 30-Day Free Trial Terms and Conditions. Whitehead ¶ 7, Ex. 2; Commerson Decl. Ex. 3, 109:7-17; Commerson Decl. Ex. 6.

### Spotify® New 30-Days Free Trial Terms and Conditions

This offer (the "New 30-Days Free Trial Offer"), which is made to you by Spotify (as defined in the Spotify Terms and Conditions of Use), entitles you access to the Spotify Premium Service (as defined in the Spotify Terms and Conditions of Use) for a period of thirty (30) days from the moment that you activate such trial period by submitting your payment details (the "Free Trial Period"). By submitting your payment details, you accept the New 30-Days Free Trial Offer and (i) consent to us using your payment details in accordance with our Privacy Policy, (ii) acknowledge and agree to Spotify Terms and Conditions of Use and these Spotify Premium Service General Free Trial Terms and Conditions. If you decide that you do not want to become a paying user of the Spotify Premium Service upon the lapse of the Free Trial Period, you have to terminate your Premium Service (instructions for this can be found at [//www.spotify.com/us/help/faq/payment/how-can-i-cancel-my-subscription/](//www.spotify.com/us/help/faq/payment/how-can-i-cancel-my-subscription/)) by the end of the Free Trial Period. You may only use this Free Trial Offer once. Spotify reserves the right, in its absolute discretion, to withdraw or to modify this Free Trial Offer and/or the Spotify New 30-Days Free Trial Terms and Conditions at any time without prior notice and with no liability.

Mr. Ingalls agreed that this language conveyed that he would have to terminate his subscription before the end of the free trial to avoid being charged. Commerson Decl. Ex. 3, 110:24-111:22. Mr. Ingalls did not recall reviewing the Spotify's 30-Day Free Trial Terms and Conditions, but admitted that he probably did not review it because he generally does not click on any links to terms and conditions. *Id.* 110:12-23.

**Payment Information Page.** After selecting to pay by credit card, to proceed, Mr. Ingalls had to click "Continue" at the bottom of the payment selection screen. This took him to a screen requiring him to enter payment information. Whitehead Decl. ¶ 7, Ex. 3; Commerson Decl. Ex. 3, 113:20-114:11; Commerson Decl. Ex. 7. Immediately above the "Confirm Payment" button, that screen stated:

> If you do not cancel your subscription before the end of the free trial the credit card you provide will automatically be charged the Spotify Premium subscription fee of US $9.99 (plus applicable taxes) per month, until you cancel. You can cancel at any time by logging into your Spotify account and follow the cancellation instructions.

4

DAVIS WRIGHT TREMAINE LLP

No refunds or credits for partial monthly subscriptions period.  For complete terms and conditions, please see our Terms of Service.

The text was also set apart from the rest of the screen in a yellow box, as shown below:

If you do not cancel your subscription before the end of the free trial the credit card you provide will automatically be charged the Spotify Premium subscription fee of US $9.99 (plus applicable taxes) per month, until you cancel. You can cancel at any time by logging into your Spotify account and follow the cancellation instructions. No refunds or credits for partial monthly subscriptions period. For complete terms and conditions, please see our Terms of Service



*Id.*  Despite its prominent location, Mr. Ingalls does not believe he read this disclosure even though he admitted he had no trouble reading the text on this page.  Commerson Decl. Ex. 3, 116:15-20; 118:14-21; 118:23-120:13; 120:15-19.  On this page, Mr. Ingalls entered his credit card information and clicked "Confirm Payment" immediately below the language quoted above.  Whitehead Decl. ¶ 7.

**Website Confirmation and E-mail Receipt.**  After completing his purchase, the website displayed a receipt on the screen.  Whitehead ¶ 8, Ex. 4; Commerson Decl. Ex. 3, 120:23-121:22; Commerson Decl. Ex. 8.  In addition, Spotify sent Mr. Ingalls an email receipt at the email address he provided during the registration process.[5]  Commerson Decl. Ex. 3, 120:23-121:22; 128:12-18; Commerson Decl. Ex. 9.  The email receipt contained a link to Spotify's 30-Day Free Trial Terms and Conditions.  *See* Commerson Decl. Ex. 3, 128:12-18; Commerson Decl. Ex. 9.

**Mr. Ingalls' Use of Spotify's Premium Service and Cancellation**.  Mr. Ingalls used Spotify's Premium service for "three to eight hours daily" during the first 2 weeks of the 30-day free trial.  Commerson Decl. Ex. 3, 131:10-132:24.  On July 8, 2013, after Mr. Ingalls's 30-day free trial expired, Spotify first charged Mr. Ingalls' credit card $9.99 for his Spotify Premium account.  *Id.* 77:13-16.  He continued to be charged $9.99 monthly until September 17, 2013, when Mr. Ingalls canceled his Premium subscription, and this amount never changed during the time he was a subscriber.  *Id.* 77:19-21; 176:17-23.  During his deposition, Mr. Ingalls claimed he did not realize he was being automatically charged until several months after the trial expired,

---

[5] The email previously attached to Mr. Whitehead's declaration as Ex. 5, is a different version from the one Mr. Ingalls received.  *See* Whitehead Depo. 87:10-21, Commerson Decl. Ex. 2.  The email receipt sent to Mr. Ingalls was attached to the FAC as Exhibit D and is attached to the Commerson Decl. at Ex. 9.

MOTION FOR SUMMARY JUDGMENT
Case No. 3:16-cv-3533 WHA
NG-S40TG52V 4833-1069-5241v.3 0098755-000014

DAVIS WRIGHT TREMAINE LLP

when he checked his credit card for the first time.  *Id.* 136:2-12.  But he admitted he could have used the Premium service until he canceled, and received the benefits of access to advertisement-free music.  *Id.* 150:25-151:12.  In addition, he admitted the service remained available to him for the remainder of the 30-day period he had paid for, had he wanted to use it.  *Id.*  Mr. Ingalls had no problem canceling, and the cancellation instructions were easy to follow.  *Id.* 143:5-18; 156:12-16.  Mr. Ingalls never requested a refund from Spotify.   *Id.* 151:14-22; 153:13-16; 208:17-21.

### 2.    Tony Hong.[6]

Plaintiff Tony Hong, a California resident, registered for Spotify's free service on November 21, 2011, using a desktop computer and a Facebook account.  Whitehead Decl. ¶ 9.  (Mr. Hong created another free account in July 2011 using an email address, but he did not use that account for any of the services at issue in this case.)  Like Mr. Ingalls, Mr. Hong was required to accept Spotify's T&Cs to complete the registration.

**Mr. Hong Registers for Premium for the First Time.** On December 29, 2014, Mr. Hong registered for Spotify's Premium service, taking advantage of a different offer than Mr. Ingalls – a holiday offer of 3 months of Premium for $0.99.  Whitehead Decl. ¶ 10.  In doing so, Mr. Hong encountered a series of different pages:

**Payment Information Page.**  On the payment selection page, Mr. Hong chose PayPal as his payment method.  Hong Depo. 26:17-20, Commerson Decl. Ex. 1.  The subsequent payment information page prompted Mr. Hong to login to his PayPal account, and further disclosed:

If you do not cancel your subscription before March 29, 2015 the credit card or payment method you provide will automatically be charged the Premium subscription fee each month, until you cancel. No refunds or credits for partial monthly subscriptions periods. for complete terms and conditions, please see our Terms of Service.

**START PREMIUM**

---

[6] In the Motion for Class Certification, plaintiffs explain that Mr. Hong does not seek to be appointed as a class representative because he is not included in the revised definition of the proposed Class plaintiffs seek to certify.  Dkt. No. 76 at 9, n. 21.  Mr. Hong has not withdrawn as a plaintiff, however, and continues to assert his individual claims.  Dkt. No. 17 at 1 ("Plaintiffs seek to pursue their claims ***individually*** and on a class basis.")

DAVIS WRIGHT TREMAINE LLP

Whitehead Decl. Ex. 6; Commerson Decl. Ex. 1, 87:9-17; Commerson Decl. Ex. 10.  During his deposition, Mr. Hong understood this disclosure to mean he had "until March 29, 2015 to cancel. Otherwise, payment will automatically be charged for Premium subscription," but he did not remember if he had read this statement.  Commerson Decl. Ex. 1 88:13-89:7; 90:7-19; *see also id.* 103:15-20.

   **Offer Terms and Conditions.**  The payment information page seen by Mr. Hong also linked to the Offer Terms and Conditions, which provided, in relevant part:

> [A]t the end of your Introductory Trial Period, you will automatically become a paying user of the Spotify Premium Service at the regular Spotify Premium monthly price, and the payment method you provided will automatically be charged the Spotify Premium subscription fee each month, until you cancel your Premium Service subscription.

Whitehead Decl. Ex. 7; Hong Depo. 91:22-92:12; Commerson Decl. Ex. 11.  This page also included additional information regarding Spotify' Premium Service, proving in full as follows:



## Spotify® Introductory Trial Offer Terms and Conditions

This offer (the "Introductory Trial Offer"), which is made to you by Spotify (as defined in the Spotify Terms and Conditions of Use), entitles you to access the Spotify Premium Service (as defined in the Spotify Terms and Conditions of Use) for a period of three (3) months from the moment that you activate such trial period by submitting your payment details and paying the advertised price (the "Introductory Trial Period"). By submitting your payment details, (i) you accept the Introductory Trial Offer, (ii) consent to us using your payment details in accordance with our Privacy Policy, (iii) acknowledge and agree to the Spotify Terms and Conditions of Use and these Introductory Trial Offer Terms and Conditions. If you decide that you do not want to remain a paying user of the Spotify Premium Service, you have to cancel your subscription to the Premium Service by logging into your Spotify account and following the prompts on the Account page, or by clicking here and following the instructions, prior to the end of your Introductory Trial Period. Otherwise, at the end of your Introductory Trial Period, you will automatically become a paying user of the Spotify Premium Service at the regular Spotify Premium monthly price, and the payment method you provided will automatically be charged the Spotify Premium subscription fee each month, until you cancel your Premium Service subscription. If you wish to cancel your Premium Service subscription after the end of your Introductory Trial Period, you may do so by following the instructions above. There are no refunds or credits for partial monthly subscriptions. If Spotify increases the monthly fee in the future, we will provide you notice. Price changes will take effect at the start of the next subscription period following the date of the price change. By continuing to use the Spotify Service after the price change takes effect, you accept the new price. You may only use this Introductory Trial Offer once. If you have subscribed to the Premium or Unlimited service or have taken a 30-day free trial offer or 60-day free trial offer previously, you are ineligible for this Introductory Trial Offer. You may also be ineligible for this Introductory Trial Offer if you have taken other previous trial offers offered by Spotify. The Spotify service may not be available on certain personal devices.

*Id.*  Mr. Hong does not remember clicking on the link to the Offer Terms and Conditions, but admitted he typically does not read the terms and conditions for subscription services for which he has subscribed.  Commerson Decl. Ex. 1, 89:23-90:6.

   **Website Confirmation and E-mail Receipt.**  After completing his purchase, Mr. Hong was shown a Web page confirming his purchase and the purchase price of "9.99 including tax per

7

DAVIS WRIGHT TREMAINE LLP

month." Whitehead Decl. Ex. 9; Commerson Decl. Ex. 3, 95:8-19; Commerson Decl. Ex. 12. Mr. Hong also received an email confirmation stating:

> You've authorised Spotify to charge you automatically every month, until you cancel your subscription. You may cancel your subscription at any time by logging into your Spotify account at https://www.spotify.com/account/subscription and following the instructions.

Whitehead Decl. Ex. 10; Commerson Decl. Ex. 1, 104:24-105:11; Commerson Decl. Ex. 13. As Mr. Hong admitted, the email confirmation clearly reminded him that he authorized Spotify to start charging him automatically after the free trial ended, until he canceled his subscription, and it explained to him how to cancel to avoid charges. Commerson Decl. Ex. 1, 106:5-12.

On March 29, 2015, the three-month term ended, and Mr. Hong's account converted to a paying Premium subscription. Commerson Decl. Ex. 1, 108:8-109:1. Mr. Hong admitted he did not remember the date when his initial free trial ended, but it did not matter, because Mr. Hong believed Spotify Premium was worth the monthly fee. *Id.* 59:21-60:10. Mr. Hong canceled his Premium subscription two days later, on March 31, 2015, but he had use of the service until the end of April. *Id.* He had no problem canceling, and the cancellation instructions were easy to follow. *Id.* 101:22-102:6. Mr. Hong has never requested a refund. *Id.* 103:22-104:9.

**Hong Registers for Premium a *Second* Time.** Just a week after his first Premium subscription expired, on May 6, 2015, Mr. Hong registered yet again for the Spotify Premium service, this time at full price. Whitehead Decl. ¶ 12.

**Payment Selection Page.** Mr. Hong reached a page where he could select from payment options. Whitehead Decl. ¶ 12, Ex. 11; Commerson Decl. Ex. 1, 113:7-14; Commerson Decl. Ex. 14. Under the heading "Start my Spotify Premium," the page stated: "$9.99 + tax per month. Cancel online anytime you want." *Id.* The page listed payment options, followed by the statement: "You hereby authorise Spotify to charge you automatically every month until you cancel your subscription. Full terms are available **here**." The word "here" was a hyperlink to the T&Cs. *Id.*

DAVIS WRIGHT TREMAINE LLP

8

**PayPal Disclosure Page.** After clicking "Continue" at the bottom of the payment screen, Mr. Hong was taken to a screen confirming his order of "1 month of recurring Spotify Premium" via PayPal.  Whitehead Decl. ¶ 12 & Ex. 12.

**Website Confirmation and E-mail Receipt.**  Spotify emailed a receipt with additional detail, which stated:  "You've authorised Spotify to charge you automatically every month, until you cancel your subscription.  You may cancel your subscription at any time by logging into your Spotify account at https://www.spotify/com/account/subscription and following the instructions." *Id.* ¶ 13 and Ex. 14; Commerson Decl. Ex. 3, 114:15-115:1; Commerson Decl. Ex. 15.  The email also included, in bright green font, a link to the T&Cs.  *Id.*  Mr. Hong continued using his Premium subscription until June 28, 2016, when he canceled.  Whitehead Decl. ¶ 13.  Plaintiffs filed this action on June 24, 2016.  Dkt. No. 4.

**Hong Registers a *Third* Time.**  Four days after canceling and a week after he filed this action, on July 2, 2016, Mr. Hong registered for a Premium subscription for a ***third*** time.  Whitehead Decl. ¶ 14.  Mr. Hong remains an active user of Spotify Premium.  *Id.* ¶ 9.[7]  He has been charged $9.99 monthly during his subscription and this amount has not changed.  Commerson Decl. Ex. 1, 139:2-10.

## IV.     ARGUMENT FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), a party moving for summary judgment bears the initial burden of identifying those portions of the record showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A movant who does not have the burden of proof on an issue at trial need only demonstrate that there is an absence of evidence to support the nonmoving party's case.  *Id.*; *In re Brazier Forest Prods., Inc.*, 921 F.2d 221, 223 (9th Cir. 1990).  *See also* Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has made its threshold showing, the burden shifts to the nonmoving party to prove the existence of a triable issue of material fact regarding that element of the cause of action or defense.  That is, the nonmoving party must present evidence that, if accepted, would

---

[7] The Terms and Conditions of Use each plaintiff agreed to when they signed up for Spotify's service also explained they would be charged a recurring monthly fee if they did not cancel prior to the expiration of any free trial periods.  *See* T&Cs § 3.3.

DAVIS WRIGHT TREMAINE LLP

support a finding in favor of the nonmoving party at trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party must "present specific facts showing that there is a genuine issue for trial."  *Huck v. Kone Inc.*,  2011 WL 6294466, at *3 (N.D. Cal. Dec. 15, 2011).  Conclusory statements, speculation, personal beliefs, and unsupported assertions will not suffice to withstand summary judgment, and a court will not "presume" "missing facts."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

Plaintiffs cannot meet their burden of demonstrating a triable issue of material fact with respect to either of their claims.[8]

### A.  Because Plaintiffs Cannot Show Injury from the Technical APRL Violations They Allege, They Lack Both Statutory and Constitutional Standing to Pursue Their Claims.

Plaintiffs allege Spotify violated the UCL, Bus & Prof. Code § 17200, asserting an alleged APRL violation as the predicate for the UCL claim.  FAC ¶¶ 69-78.[9]  The UCL claim fails because plaintiffs lack both constitutional and statutory standing.

Proposition 64 amended the UCL in 2004 to end longstanding abuses by "prohibit[ing] private attorneys from filing lawsuits for unfair competition where they have no client who has been injured in fact."  *Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 228 (2006) (quoting Prop. 64, § 1, subd. (e) (2004); *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 547 (2013) (the UCL "has been crafted to preclude the shakedown lawsuit").  To have standing under the UCL after Proposition 64, plaintiffs must establish they (i) suffered an injury-in-fact; and (ii) lost money or property *as a result of unfair competition*.  *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 852 (2008) (citing Bus. & Prof. Code § 17204) (emphasis added).  Here, Mr. Hong and Mr. Ingalls cannot show actual damage or loss *as a result of* the alleged failure to display auto-renewal terms in strict conformity with the technical

---

[8] Under Rule 56, upon a showing there is no genuine dispute of material fact as to a claim or defense, a court may grant summary judgment in the party's favor on "each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

[9] Plaintiffs also assert a cause of action for violation of the APRL.  Dkt. No. 17, ¶¶ 56-68.   As explained in Section IV-B, however, the APRL does not afford a private right of action.  But even if an APRL claim were available, plaintiffs would be required to prove a concrete injury to recover—which they cannot do.

requirements of Bus. & Prof. Code §17602, or in fact any **actual damage or loss** at all.  They therefore lack standing to pursue their claims, and the Court should grant summary judgment.

> ### 1.   Plaintiffs Could Not Have Been Injured by Allegedly Defective Disclosures They Did Not Read.

Plaintiffs' claims fail in the first instance because they cannot demonstrate injury "as a result of" the Spotify disclosures at issue – *i.e.*, causation.  "When a UCL action is based on an unlawful business practice . . . . there must be a causal connection between the harm suffered and the unlawful business activity.  ***That causal connection is broken when a complaining party would suffer the same harm whether or not a defendant complied with the law***."  *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1099 (2007) (emphasis added); *Hall*, 158 Cal. App. 4th at 849 ("[T]he alleged unfair competition **must have caused** the plaintiff to lose money or property.") (emphasis added).

In addition, Article III of the U.S. Constitution requires plaintiffs to demonstrate they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).

Here, neither plaintiff can demonstrate any harm caused by the disclosures they contend were deficient.  Mr. Ingalls, for example, testified he **did not read** Spotify's disclosure regarding the automatic renewal terms before he signed up, even though it appeared **immediately above** the "Confirm Payment" button he clicked when signing up:

> Q: So when you provided your payment information and hit the confirm payment button, is it your testimony that you did not read the information above the confirm payment button?
> …
> A: I must not have.  (Commerson Decl. Ex. 3, 116:15-20.)

> Q: [I]t's your belief that you did not read the text in the highlighted box above the confirm payment button when you were completing this transaction; is that correct?

> A: Correct.  (*Id.* 120:15-19.)

---

During his deposition, Mr. Ingalls could see the disclosure on the page and had no trouble reading the disclosure when it was shown to him at deposition. *Id.* 114:22-115:20; 118:14-21.  Moreover, he admitted that, had he read it at the time of purchase, he ***would have understood his credit card would automatically be charged the recurring monthly fee until he canceled***:

> Q: Does this language [above the "Confirm Payment" button] explain to you that once the 30-day free trial ended, you would be charged the $9.99 fee automatically to your credit card until you canceled?
> [Objection.]
>
> A: Reading it here now, yes.

*Id.* 114:22-115:20; *see also* 115:21-116:7; 118:23-120:13.  He also admitted that, had he read the disclosure, he would have understood Spotify had a policy against providing partial refunds.  *Id.* 116:3-7.  Thus, any hypothetical injury Mr. Ingalls suffered arose only because he decided not to read the disclosures Spotify presented repeatedly throughout the transactional process—not from the contents of those disclosures.

Similarly, Mr. Hong testified he had no recollection of reading Spotify's automatic renewal disclosures, but admitted he would have understood them had he done so:

> Q: So is it your testimony that when you signed up for the three months of Premium for 99 cents, you didn't read this language that's on the page?
>
> A: I don't remember.
>
> Q: Okay.  But is it true, in fact, that, had you read the language on this page, you would have understood that, when your three-month trial ended, your subscription for Spotify Premium would automatically renew at a price of 9.99 per month? Is that correct?
> [Objection.]
>
> A: As you said, if I had read it and remembered, yes, I would have understood it.

Commerson Decl. Ex. 1, 90:7-19; *see also id.* 103:15-20.

Because plaintiffs did not bother to read Spotify's auto-renewal disclosures at all, they could not have been affected—much less injured—by any alleged deficiency in the disclosures. The decision in *Turcios v. Carma Labs, Inc.*, 296 F.R.D. 638 (C.D. Cal. 2014), confirms this point.  There, the plaintiff brought a putative class action alleging the defendant's packaging of its lip balm product violated the Fair Packing and Labeling Act ("FPLA"), and asserted the FPLA violation as the predicate for a claim under the UCL.  The court rejected plaintiffs' assertion "that

12

DAVIS WRIGHT TREMAINE LLP

a violation of the FPLA creates automatic UCL standing[.]." *Id.* at 644.  Rather, the Court noted

that the plaintiff admitted he started purchasing the lip balm because it was a good product,

without comparing it to other products, and ***did not inspect*** the product's packaging prior to his

purchases.  *Id.*  Because plaintiff thus did not present "any evidence that his alleged economic

injury occurred ***as a result of*** Defendant's alleged violation of the FPLA," *i.e.*, as a result of any

technical defects in the labeling, the Court held that he lacked standing.  *Id.* (emphasis added); *see

also Kissel v. Omega Natural Sci., Inc.*, 2016 WL 9019613, at *3-4 (C.D. Cal. Aug. 22, 2016)

(dismissing UCL claim based on APRL violation where plaintiff did not allege "she would have

done anything differently with her [Product] subscription had she been sent a more robust email

after making her purchase, that she was unable to manage or cancel her account, or that the

supposed lack of a proper acknowledgment affected her in any way"); *Peterson v. Cellco P'ship*,

164 Cal. App. 4th 1583, 1592-93 (2008) (finding trial court properly found plaintiffs lacked

standing where they claimed Insurance Code violations supported UCL claim but could show no

injury from alleged violation).

　　　　For similar reasons, plaintiffs also cannot demonstrate actual ***reliance*** on the disclosures at

issue, which is required for a UCL claim based on the APRL.  The APRL is a statute aimed at

ending deceptive practices regarding recurring charges to customers.  Dkt. 76-2, Exh. A at 3

(APRL passed in "response to reported consumer complaints that certain businesses … lure

consumers into signing up for 'automatic renewals' without the consumer's full knowledge or

consent.")   Because plaintiffs' claim rests on a theory of deceptive disclosures, they must

demonstrate not only causation, but actual reliance—no matter which prong of the UCL they

invoke.[10]  Thus, plaintiffs must show they were actually deceived by Spotify's statements or

---

[10] *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1363 (2010) ("[W]e conclude the reasoning of *Tobacco II* [requiring actual reliance] applies equally to the 'unlawful' prong of the UCL when, as here, the predicate unlawfulness is misrepresentation and deception."); *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1047 (N.D. Cal. 2014) ("California courts have held that when the 'unfair competition' underlying a plaintiff's UCL claim consists of a defendant's misrepresentation or omission, ***a plaintiff must have actually relied on the misrepresentation or omission, and suffered economic injury as a result of that reliance***, to have standing to sue.") (emphasis added)).

DAVIS WRIGHT TREMAINE LLP

omissions regarding the recurring nature of the charges for Premium, and that they would have

acted differently had the disclosures followed the APRL.

It is well settled that plaintiffs cannot demonstrate reliance based on the alleged

insufficiency of disclosures they did not read.  "A consumer cannot decline to read clear and easily

understandable terms that are provided on the same webpage in close proximity to the location

where the consumer indicates his agreement to those terms and then claim that the webpage,

which the consumer has failed to read, is deceptive."  *Baxter v. Intelius, Inc.*, 2010 U.S. Dist.

LEXIS 104218, at *12 (C.D. Cal. Sept. 16, 2010) (finding webpage not deceptive as a matter of

law) (citation omitted); *see also Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1163 (9th Cir.

2012) (plaintiff's failure to read an important disclosure that was "within [plaintiffs'] observation"

was fatal to plaintiffs' claims).  Because plaintiffs would have "suffer[ed] the same [alleged] harm

[i.e., paying for the recurring Spotify Premium service] whether or not [Spotify] complied with the

law," *Daro*, 151 Cal. App. 4th at 1099, they lack standing to pursue their claims.[11]

> **2.    Plaintiffs Suffered No Injury in Fact Because They Admit They Used the Premium Service, and Were Able to Cancel When They No Longer Wanted It.**

Plaintiffs' UCL claim also fails because they have suffered no injury in fact.  "[B]eing

induced to purchase a product one would not otherwise have purchased is not loss of money or

property within the meaning of [the UCL] *as long as one still receives the benefit of the*

*bargain*."  *Warner v. Tinder, Inc.*, 105 F. Supp. 3d 1083, 1094 (C.D. Cal. 2015) (citation omitted;

emphasis added).  As courts in this Circuit have made clear, just because a plaintiff "expended"

---

[11]  *See also, e.g., In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1027 (N.D. Cal. 2013) (granting summary dismissal of plaintiffs' UCL claim because plaintiffs proffered no evidence they "saw one or more of Apple's alleged misrepresentations, that they actually relied on those misrepresentations, and that they were harmed thereby"); *Laster v. T-Mobile USA, Inc.,* 407 F. Supp. 2d 1181, 1183 (S.D. Cal. 2005) (dismissing UCL claim based on allegedly false advertisements for cell phone service where "none of the named Plaintiffs allege that they saw, read, or in any way relied on the advertisements; nor [did] they allege that they entered into the transaction as a *result* of those advertisements."); *Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 948 (S.D. Cal. 2007) (dismissing UCL claim alleging that thread count of linens was lower than advertised where plaintiff admitted she did not rely on any alleged misrepresentation when making her purchase); *Cullen v. Netflix, Inc.*, 2013 U.S. Dist. LEXIS 4246, at *12 (N.D. Cal. Jan. 10, 2013) (dismissing UCL claim because plaintiff failed to establish with certainty that Netflix's statements caused him to continue subscription).

DAVIS WRIGHT TREMAINE LLP

money, does not mean plaintiff "lost" money. *Id.* at 1094-95 (citation omitted). In this case, both Mr. Ingalls and Mr. Hong admit they received the benefit of their bargain and therefore have no "lost" money as required by the statute.

In *Warner,* the plaintiff brought claims under the UCL against Tinder for allegedly increasing the price of plaintiff's Tinder Pro App after he purchased his subscription. The court dismissed the UCL claim because the plaintiff had failed to allege "that he did not want Tinder Plus (at any price), that Tinder Plus was unsatisfactory, or that Tinder Plus was worth less than what he paid for it." 105 F. Supp. 3d at 1095. Other courts have reached similar conclusions when reviewing UCL claims premised on alleged APRL violations. *E.g., Mayron v. Google, Inc.,* 2016 WL 1059373 (Cal. Super. Feb. 6, 2016) ("If Plaintiff used the [data storage] service for which he was charged, then it is not apparent how he has lost money or property as a result of any allegedly unlawful conduct by Defendant: Defendant simply charged Plaintiff for a service provided to Plaintiff that Plaintiff used."); *Kissel v. Omega Natural Sci., Inc.*, 2016 WL 9019613, at *3-4 (C.D. Cal. Aug. 22, 2016) (dismissing APRL claim because plaintiff failed to allege a concrete injury from the failure to provide acknowledgement required by statute).

Here, Mr. Hong continued to use and enjoy Spotify Premium long after he was charged recurring fees, even re-subscribing to the service ***twice***, including ***after*** this suit was filed. Commerson Decl. Ex. 1, 108:10-15; 112:23-113:2. He testified he forgot the date when his initial free trial ended, but admitted that even if he recalled it, he would have continued the service ***because he believed it was worth the recurring monthly fee***:

> Q: So I believe you testified that, by the time the three-month trial ended, you'd forgotten about the end date; is that correct?
>
> A: Yes.
>
> Q: So, at that time, had you been aware that the three-month trial would terminate on a given date, would you have still continued the service?
>
> A: I believe so.
>
> Q: Because you enjoyed using it?
>
> A: Yeah.
>
> Q: And was it worth 9.99 a month to you?

DAVIS WRIGHT TREMAINE LLP

A: Yes.

Q: And, indeed, you're continuing to use it?

A: **Yeah. The fact that I'm a current Premium member now, yeah.**

Commerson Decl. Ex. 1, 59:21-60:10 (emphasis added).[12]

For his part, Mr. Ingalls admitted he used the Premium service for "three to eight hours daily" during the first 2 weeks of the 30-day free trial.  Commerson Decl. Ex. 3, 131:10-132:24.  He claimed he did not realize he was being automatically charged until several months after the trial expired, when he checked his credit card for the first time.  *Id.* 136:2-12.  But he admitted he could have used the Premium service until he canceled, and received the benefits of having access to advertisement-free music.  *Id.* 150:25-151:12.  Further, both plaintiffs had no difficulty canceling their subscriptions, admitting the cancellation instructions provided by Spotify were easy to follow.  Commerson Decl. Ex. 1, 101:22-102:6; Commerson Decl. Ex. 3, 143:5-18; 156:12-16.  And **neither** plaintiff ever requested a refund from Spotify.  Commerson Decl. Ex. 1, 103:22-104:9; Commerson Decl. Ex. 3, 151:14-22; 153:13-16; 208:17-21.

Because plaintiffs received a service they used, and that they easily canceled when they no longer wanted it, they received the benefit of their bargain.  What's more, they admit they received exactly what they would have expected **had they read Spotify's disclosures**, i.e., an automatically renewing service.  *See Baggett v. Hewlett-Packard Co.*, 2009 WL 3178066, at *3-4 (C.D. Cal. Sept. 29, 2009) (rejecting UCL claim where plaintiff could not establish that the loss was "unexpected" or "relatively unpredictable" because he received the product he paid for); *Hall*, 158 Cal. App. 4th at 855 (plaintiff lacked standing where he received book in exchange for payment).

Because plaintiffs admit they did not read Spotify's disclosures, and received a service they used and were able to cancel without difficulty, they lack standing to bring their claims.[13]

---

[12] Mr. Hong even admitted he is not entitled to any refund, explaining "[t]he fact that I'm still a Premium member" shows "I'm willing to pay for it."  Commerson Decl. Ex. 1, 63:9-13; *see also id.* 104:4-9; 101:14-21.

[13] Nor does Section 17603 of the APRL confer standing on plaintiffs.  That provision treats as an "unconditional gift" any "goods, wares, merchandise, or products" that a business "sends" to a customer under an automatic renewal provision "without first obtaining the consumer's affirmative consent."  Bus. & Prof. Code §17603.  It does not apply to Spotify's music streaming service, as it "only applies to tangible goods or products."  *Mayron v. Google, Inc.*, 2016 Cal. Super. LEXIS 173, at *8 (Feb. 26, 2016) (Section 17603 did not apply to defendant's data storage

### B.   Plaintiffs' Cause of Action for Alleged Violation of the APRL Fails Because the APRL Does Not Confer a Private Right of Action.

Plaintiffs' cause of action brought directly under the APRL also fails as a matter of law because the statute does not authorize a private right of action.  Rather, the remedies section of the statute states only that "all available civil remedies that apply to a violation of this article may be employed."  Bus. & Prof. Code § 17604.  Courts have found "[t]his statement, the only language in the statute specifically addressing remedies, certainly does not create a new cause of action for private parties by its express terms."  *Roz v. Nestle Waters N. Am., Inc.*, 2017 WL 132853, at *5 (C.D. Cal. Jan. 11, 2017).  "No provision within [APRL] either explicitly or implicitly supports any legislative intent to create a private cause of action."  *Johnson v. Pluralsight, LLC*, 2017 WL 661953, at *4 (E.D. Cal. Feb. 17, 2017)

The legislative history supports this conclusion.  Where "[t]here is no case law that interprets [a] term," "[u]nder established principles of statutory construction the Court must look to the language of the statute itself and its legislative history."  *Sierra E. Television, Inc. v. Westar Cable Television, Inc.*, 776 F. Supp. 1405, 1411 (E.D. Cal. 1991) (citation omitted).  The legislative history of the APRL contains the following discussion:

> [3.  Remedies available under the bill]
>
> Senate Bill 340 would provide that a violation of its provisions would not be a crime, but ***all applicable civil remedies would be available***.
>
> Under the FAA [False Advertising Act], any person who violates any provision of the FAA is liable for a civil penalty not to exceed $2,500 for each violation that must be assessed and recovered in a civil action by the Attorney General or by any district attorney, county counsel, or city attorney.  Under the UCL [Unfair Competition Law], a private party may bring a civil action for injunctive relief and/or for restitution of profits that the defendant unfairly obtained from that party.  However, the party must have suffered an injury in fact and lost money or property.

*Johnson*, 2017 WL 661953, at **4-5 (quoting Senate Judiciary Comm. Rep.; emphasis added).  This "discussion of existing enforcement mechanisms within the Legislative history, coupled with the words 'all available' within § 17604(a), strongly supports a Legislative intent to pursue causes

---

service); *Johnson v. Pluralsight, LLC,* 2017 U.S. Dist. LEXIS 23294 (E.D. Cal. Feb. 17, 2017) (Section 17603 did not apply to defendant's online video subscription service.)  Moreover, "Section 17603 is only intended as a shield against a seller seeking payment for a good sent in violation of the Automatic Renewal Law; it is not intended to authorize a consumer to bring an action."  *Mayron*, 2016 Cal. Super. LEXIS 173, at *8.

17

DAVIS WRIGHT TREMAINE LLP

1   of action for violations of [APRL] under existing laws," such as the UCL.  *Id.* at \*5. Thus, the

2   APRL "does not create a private right of action.  The Legislature intended for aggrieved

3   consumers to utilize existing laws to protect themselves from injuries related to automatic renewal

4   or continuous service offers."  *Johnson*, 2017 WL 661953, at \*5.  Similarly, in *Roz*, 2017 WL

5   132853, at \*5, the court found the APRL "did not create a private right of action for private parties

6   injured by violations of the law.  Instead, the legislature expected consumers to protect themselves

7   by bringing suit under existing laws in the code that had already created private rights of action."[14]

8        Because a violation of APRL cannot itself serve as the basis for an independent cause of

9   action, plaintiffs cannot bring a claim directly under that statute.  In addition, even if the APRL

10  provides a private right of action (it does not), the same standing requirements would apply as

11  under the UCL.  *See, e.g., Kissel v. Code 42 Software, Inc.*, 2016 U.S. Dist. LEXIS 184368, at

12  \*\*20-21 (C.D. Cal. Apr. 14, 2016) (erroneously finding APRL confers a private right of action,

13  but holding APRL claim must satisfy UCL's standing requirements).  Because plaintiffs lack

14  standing for the reasons set forth in Section IV-A, the APRL claim also fails for this reason.

15       **C.    Plaintiffs Lack Standing to Seek Injunctive Relief.**

16       Plaintiffs purport to seek an injunction on behalf of themselves and the Class.  FAC ¶ 76,

17  and Prayer for Relief C.  But, to establish standing for prospective injunctive relief under Article

18  III, plaintiffs must demonstrate they have "suffered or [are] threatened with a 'concrete and

19  particularized' legal harm . . . coupled with 'a sufficient likelihood that [they] will again be

20  wronged in a similar way.'"  *Bates v. United Parcel Serv.*, 511 F.3d 974, 985 (9th Cir. 2007)

21  (citations omitted).  "[P]ast exposure to illegal conduct does not in itself show a present case or

22

23  _____

    [14] The court in *Johnson* also cited superior court cases finding no private right of action under the

24  APRL.  *Id.* at \*5 n.9 (*citing Mayron*, 2016 WL 1059373, at \*3 (providing "the use of the language
    'all available' indicates that no new private right of action has been created; rather, a party can rely
    on civil remedies that already exist."); *Siciliano v. Apple, Inc.*, 2016 Cal. Super. LEXIS 1099, at

25  \*\*12–13 (Cal. Super. Ct. May 16, 2016) (concluding "the legislative history [of APRL]
    contemplated restitution by means of an existing civil remedy, a cause of action under the UCL.")

26  (internal citations omitted)).  One court, *Kissel v. Code 42 Software, Inc.*, 2016 U.S. Dist. LEXIS
    184368, at \*20 (C.D. Cal. Apr. 14, 2016), has found the APRL authorizes a private right of action.

27  But *Code 42* misses "a crucial distinction between the existence of a private right to enforce [the
    APRL] (such as under the UCL…), and the existence of an independent cause of action under [the
    APRL] itself."  *Johnson*, 2017 WL 661953, at \*4.

28

18

controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 95-96 (1983) (citation omitted). In *Luman v. Theismann*, 647 Fed. App'x 804 (9th Cir. 2016), for example, the Ninth Circuit affirmed the district court's dismissal of the plaintiffs' injunctive relief claims due to lack of standing "[b]ecause Plaintiffs do not allege that they intend to purchase [defendant's product SBP] in the future." *Id.* at 807 (citing *Perez v. Nidek Co.,* 711 F.3d 1109, 1113-14 (9th Cir. 2013)). As a result, "[i]f a plaintiff has knowledge of a defendant's practices, that plaintiff cannot have standing to seek injunctive relief to redress injuries caused by those practices, because the plaintiff's knowledge precludes him from showing a likelihood of being injured in the future by those practices." *In re Intel Laptop Battery Litig.*, 2011 WL 7290487, at *2 (N.D. Cal. Apr. 7, 2011) (citation omitted).

Based on these principles, in *Becker v. Skype Inc.*, 2014 WL 556697, at *3 (N.D. Cal. Feb. 10, 2014), the Court held the plaintiff could not show a likelihood of future injury for injunctive relief with respect to alleged APRL violation because the plaintiff had "already been subject to the contested auto-renew policy, spoken to Skype about it, and received a refund for the first auto-renew applied to his account"; as a result, "Plaintiff simply cannot reasonably argue that he stands to be fooled again in the future." *Id.* at *3. In *Castagnola v. Hewlett-Packard Co.*, 2012 WL 2159385 (N.D. Cal. June 13, 2012), the Court found plaintiffs were not entitled to injunctive relief because they failed to "allege that they intend to purchase products from Snapfish.com in the future or that, if they did, they would seek to participate in the Snapfish Valuepass program." *Id.* at *6. "Even if they did include such allegations," the court added, the plaintiffs had not shown that they would be harmed by the defendant's conduct in the future because the "plaintiffs now have knowledge of the terms and conditions of the program." *Id.*

Here, as in *Becker* and *Castagnola*, plaintiffs have actual knowledge of the auto-renewal terms for Spotify Premium and therefore cannot show a likelihood of being injured in the future. In fact, Mr. Hong has subscribed to Spotify Premium on three separate occasions, and admits he was fully aware he would be automatically charged for the service until he canceled when he re-subscribed. Commerson Decl. Ex. 1, 101:18-21. Mr. Ingalls testified he does not intend to

MOTION FOR SUMMARY JUDGMENT
Case No. 3:16-cv-3533 WHA
NG-S40TG52V 4833-1069-5241v.3 0098755-000014

DAVIS WRIGHT TREMAINE LLP

purchase Spotify Premium in the future.  Commerson Decl. Ex. 3, 154:2-14.  And both plaintiffs know how to avoid the auto-renewal charge after a free trial because they both successfully canceled their Premium subscription when they chose to do so.  Commerson Decl. Ex. 1, 101:22-102:6; Commerson Decl. Ex. 3, 143:5-18.  Given their knowledge of the auto-renewal policy, and their proven ability to avoid any unwanted future charges, plaintiffs face no imminent injury sufficient to give them Article III standing to pursue a claim for injunctive relief.

Because plaintiffs' claim is based on charges that have already occurred with no likelihood of future harm, a favorable decision on injunctive relief would not redress any alleged injuries, plaintiffs lack Article III standing to seek injunctive relief.  *Lujan*, 504 U.S. at 561.

## **CONCLUSION**

For these reasons, Spotify requests the Court grant summary judgment in its favor on the claims set forth above.

DATED: June 1, 2017

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP
Joseph E. Addiego, III
Stephen M. Rummage
Scott R. Commerson

By:  */s/ Joseph E. Addiego III*
      Joseph E. Addiego III

Attorneys for Defendant
SPOTIFY USA INC.

DAVIS WRIGHT TREMAINE LLP

MOTION FOR SUMMARY JUDGMENT
Case No. 3:16-cv-3533 WHA
NG-S40TG52V 4833-1069-5241v.3 0098755-000014