Joseph E. Addiego III (CA State Bar No. 169522)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111
Telephone:      (415) 276-6500
Facsimile:      (415) 276-6599
Email:          joeaddiego@dwt.com

Stephen M. Rummage (Admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, Washington  98101-3045
Telephone:      (206) 662-3150
Fax:            (206) 757-7700
E-mail:         steverummage@dwt.com

Scott R. Commerson (CA State Bar No. 227460)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa St., Suite 2400
Los Angeles, California 900017
Telephone:      (213) 633-6890
Fax:            (213) 633-4290
Email:          scottcommerson@dwt.com

Attorneys for Defendant
SPOTIFY USA, INC.

## IN THE UNITED STATES DISTRICT COURT

## THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY INGALLS and TONY HONG, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>SPOTIFY USA, INC., a Delaware corporation; and DOES 1 – 10, inclusive,<br><br>        Defendants. | Case No. 3:16-cv-3533 WHA<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>[Assigned to the Hon. William H. Alsup]<br><br>Date:  July 13, 2017<br>Time:  8:00 a.m.<br>Judge: Hon. William H. Alsup<br>Courtroom 8 – 19th Floor |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

II.   FACTUAL BACKGROUND ........................................................................ 2

      A.    Spotify's Registration Process Over Class Period, and Ingalls' Experience. .................................................................................................. 2

      B.    Gregory Ingalls' Background and Use of Spotify Premium. ................... 6

      C.    Spotify's Terms and Conditions. ............................................................ 7

      D.    Spotify's Easy-to-Use Cancellation Mechanism. ................................... 8

III.  PLAINTIFFS' CLAIMS AND THE PROPOSED CLASS ................................ 8

IV.   LEGAL ARGUMENT .................................................................................... 9

      A.    Ingalls' Claims Are Atypical, and He Is An Inadequate Representative. ............... 10

            1.    The Substantial Individual Standing Defense to Ingalls' Claims Means He Is Not an Adequate or Typical Class Representative ............... 11

            2.    Ingalls Cannot Represent Class Members Who Were Exposed to Different Disclosures ................................................................. 13

            3.    Ingalls is an Inadequate Class Representative Because He Was Recruited by Class Counsel, and Is Neither Informed nor Actively Monitoring the Case. ............................................... 14

      B.    Ingalls Cannot Establish Predominance, Commonality, or Superiority, Preventing Certification of the Proposed Rule 23(b)(3) Class .............................. 15

            1.    Individual Questions Permeate the UCL Restitution Analysis, Barring Certification of UCL Claims for Monetary Relief. ....................... 16

      C.    Certification of a Rule 23(b)(2) Class Would Be Improper. .................................. 24

            1.    Ingalls Lacks Standing to Seek Injunctive Relief. ...................................... 24

            2.    Injunctive Relief Is Inappropriate Because Monetary Claims Predominate. ................................................................................. 25

V.    CONCLUSION ................................................................................................ 25

i

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 3:16-cv-3533 WHA
4851-7906-5674v.8 0098755-000014

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberghetti v. Corbis Corp.*,
  263 F.R.D. 571 (C.D. Cal. 2010) ................................................................................14

*Am. Ex. Co. v. Italian Colors Rest.*,
  133 S. Ct. 2304 (2013) ...............................................................................................10

*Am. Oil Serv. v. Hope Oil Co.*,
  194 Cal. App. 2d 581 (1961).......................................................................................22

*Anderson v. Jamba Juice Company*,
  2012 U.S. Dist. LEXIS 120723 (N.D. Cal. 2012).......................................................11

*Backhaut v. Apple, Inc.*,
  74 F. Supp. 3d 1033 (N.D. Cal. 2014) ..................................................................11, 20

*Becker v. Skype Inc.*,
  2014 WL 556697 (N.D. Cal. 2014)..............................................................................24

*Berger v. Home Depot*,
  741 F.3d 1061 (9th Cir. 2014).....................................................................................14

*Bodner v. Oreck Direct, LLC*,
  2007 WL 1223777 (N.D. Cal. 2007).......................................................................14, 15

*Campion v. Old Republic*,
  272 F.R.D. 517 (S.D. Cal. 2011)..................................................................................18

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996).........................................................................................10

*Chowning v. Kohl's Dep't Stores, Inc.*,
  2016 WL 1072129 (C.D. Cal. 2016).............................................................................19

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .......................................................................................................24

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) .............................................................................................9, 18

*Deitz v. Comcast Corp.*,
  2007 U.S. Dist. LEXIS 53188 (N.D. Cal. 2007)....................................................12, 17, 18, 24

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 3:16-cv-3533 WHA
4851-7906-5674v.8 0098755-000014

*Doyle v. Chrysler Grp, LLC*,
  663 Fed. Appx. 576 (9th Cir. 2016) ...........................................................................19

*Dukes v. Wal-Mart Stores, Inc.*,
  603 F.3d 571 (9th Cir. 2010),
  *rev'd on other grounds*, 564 U.S. 338 (2011) ...........................................................16

*Endres v. Wells Fargo Bank*,
  2008 WL 344204 (N.D. Cal. 2008)..............................................................................22

*English v. Apple Inc.*,
  2016 WL 1188200 (N.D. Cal. 2016)............................................................................12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) .....................................................................................................16

*Fields v. Mobile Messengers Am., Inc.*,
  2013 WL 6073426 (N.D. Cal. Nov. 18, 2013)............................................................21

*Gary Plastic Packaging Corp. v. Merrill Lynch*,
  903 F.2d 176 (2d Cir. 1990).........................................................................................10

*Gawry v. Countrywide Home Loans Inc.*,
  640 F. Supp. 2d 942 (N.D. Ohio 2009) ........................................................................22

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) .....................................................................................................10

*Hanon v. Dataprods. Corp.*,
  976 F.2d 497 (9th Cir. 1992).................................................................................10, 12

*Hodgers-Durgin v. De La Vina*,
  199 F.3d 1037 (9th Cir. 1999)......................................................................................24

*In re Beer Distrib. Antitrust Litig.*,
  188 F.R.D. 549 (N.D. Cal. 1998) .................................................................................16

*In re Facebook, Inc., PPC Advert. Litig.*,
  282 F.R.D. 446 (N.D. Cal. 2012) .................................................................................14

*In re Intel Laptop Battery Litig.*,
  2011 WL 7290487 (N.D. Cal. 2011).............................................................................24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) .................................................................................14

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
  571 F.3d 953 (9th Cir. 2009).........................................................................................16

*Johnson v. Pluralsight, LLC*,
    2017 U.S. Dist. LEXIS 23294 (E.D. Cal. Feb. 17, 2017) ........................................19

*Jones v. ConAgra Foods, Inc.*,
    2014 WL 2702726 (N.D. Cal. June 13, 2014) ........................................................20

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013)..............................................................................18, 19

*Lopez. v. Wash. Mut. Bank, F.A.*,
    2002 U.S. App. LEXIS 24344 (9th Cir. 2002).........................................................23

*Lubin v. Sybedon Corp.*,
    688 F. Supp. 1425 (S.D. Cal. 1988) ........................................................................15

*Mayron v. Google, Inc.*,
    2016 Cal. Super. LEXIS 173 (Feb. 26, 2016) ..........................................................19

*McKinnon v. Dollar Thrifty Auto. Grp.*,
    2016 U.S. Dist. LEXIS 154386 (N.D. Cal. 2016)......................................................12

*Murray v. Sears, Roebuck and Co.*,
    2014 U.S. Dist. LEXIS 18082 (N.D. Cal. 2014)............................................10, 14, 25

*Parino v. Bidrack, Inc.*,
    838 F. Supp. 2d 900 (N.D. Cal. 2011) .....................................................................22

*Pfizer Inc. v. Superior Court*,
    182 Cal. App. 4th 622 (2010)..................................................................................20

*Philips v. Ford Motor Co.*,
    2016 U.S. Dist. LEXIS 177672 (N.D. Cal. 2016).......................................................21

*Probe v. State Teachers' Retirement Sys.*,
    780 F.2d 776 (9th Cir. 1986)....................................................................................25

*Pulaski & Middleman, LLC v. Google*,
    802 F.3d 979 (9th Cir. 2015).......................................................................18, 19, 20

*Russell v. Kohl's Dep't Stores, Inc.*,
    2015 WL 12748629 (C.D. Cal. 2015) .......................................................................20

*Spagnola v. Chubb*,
    264 F.R.D. 76 (S.D.N.Y. Jan. 7, 2010) ....................................................................22

*Vinole v. Countrywide Home Loans*,
    571 F.3d 935 (9th Cir. 2009)....................................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..........................................................................10, 13, 16, 25

iv

*Wang v. Chinese Daily News*,
  737 F.3d 538 (9th Cir. 2013) ..................................................................................16

*Webb v. Carters, Inc.*,
  272 F.R.D. 489 (C.D. Cal. 2011) ............................................................................20

*Welling v. Alexy*,
  155 F.R.D. 654 (N.D. Cal. 1994) ............................................................................15

*Zinser v. Accufix Research Inst.*,
  253 F.3d 1180 (9th Cir. 2001) ..............................................................10, 16, 22, 25

**Statutes**

Business & Professions Code § 17600 .............................................................................8, 9

Business and Professions Code § 17602 ............................................................................1

Civ. Code § 1780(a) ..........................................................................................................11

Civ. Code § 17601(b)(2) ...................................................................................................23

Civ. Code § 17602(a)(2) ...................................................................................................23

**Rules**

Rule 23 ...................................................................................................................9, 10, 13

Rule 23(a) .....................................................................................................................1, 10

Rule 23(b) ...................................................................................................................10, 15

Rule 23(b)(2) ..............................................................................................................2, 24, 25

Rule 23(b)(3) ..........................................................................................................1, 15, 16, 24

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 3:16-cv-3533 WHA
4851-7906-5674v.8 0098755-000014

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Gregory Ingalls seeks to certify a class of California customers who purchased various trials of Spotify's automatically renewing music streaming service via a credit or debit card.  Ingalls rests his claims on the allegation that Spotify's disclosures fell short of the technical requirements of California Business and Professions Code § 17602, and the claim that every user of Spotify's service—even if they understood they were getting an automatically renewing monthly subscription and fully took advantage of the service—is entitled to a refund, without regard to individual circumstances.  But the law and the facts make clear that even if Ingalls proves a violation of the ARPL's disclosure requirements, the right to relief turns on individual proof.  Moreover, Ingalls' particular circumstances make him ineligible to represent the proposed class.  The Court should deny Ingalls' Motion for the following reasons:

***No Typicality or Adequacy***.  Ingalls cannot satisfy Rule 23(a)'s typicality and adequacy requirements.  Because he chose not to read Spotify's prominent disclosures when he purchased the Premium service, Ingalls was not injured by any alleged omission from Spotify's disclosures and therefore lacks standing.  He is also atypical and inadequate because his circumstances subject him to unique defenses that could prejudice absent class members, including his admission that he did not read ***any*** of Spotify's disclosures (even though he owned a consumer-facing website that used disclosures to authorize his customers' credit card purchases).  Further, Ingalls' claims are not typical of the claims of the many Spotify customers who were exposed to different disclosures than he saw.  Finally, Ingalls has not demonstrated the capacity to vigorously represent absent class members:  he was recruited for this litigation by his girlfriend, a lawyer with a firm that seeks to serve as class counsel, and he has not kept himself informed of litigation developments.

***No Predominance or Superiority.***  Ingalls seeks certification of damage claims under Rule 23(b)(3), which requires him to show that common issues would predominate in litigation of his claims and that a class action would be a superior method of adjudicating the claims.  In fact, trial on Ingalls' claim under the Unfair Competition Law, Business & Professions Code § 17200 ("UCL") would be dominated by disputes over individual issues, including (for example) whether the consumer chose to read Spotify's disclosures; whether the consumer received what she

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 3:16-cv-3533 WHA
4851-7906-5674v.8 0098755-000014

wanted, barring any claim for restitution under the UCL; whether the consumer requested or received a refund; and whether the consumer has Article III or statutory standing.  Ingalls admits the Spotify.com website repeatedly disclosed the auto-renewing nature of the service, so many (and probably most) members of his proposed class knew exactly what they were buying and received exactly what they wanted—as is the case with the other named plaintiff, Tony Hong.  The record shows these individual issues predominate, and a class action would not be superior.

*No Alternative Grounds for Certification.*  Ingalls tosses off a paragraph asking the Court to certify his claims under Rule 23(b)(2).  But he lacks standing to seek injunctive relief, and seeks primarily damages, precluding 23(b)(2) certification.

## II.     FACTUAL BACKGROUND

**A.     Spotify's Registration Process Over Class Period, and Ingalls' Experience.**

Spotify users must register to use any Spotify service, including the free service.  Lambert Decl. ¶ 5.  To register, subscribers may go to Spotify.com using a web browser on a computer, tablet, or mobile phone, or they may download the Spotify application on an Apple, Android, or Windows mobile phone or tablet, or Sony PlayStation.  *Id.*  To upgrade to Spotify Premium, new users are presented with a series of web pages that contain Spotify's pre- and post-purchase disclosures.  While the price for a Premium subscription has remained $9.99 throughout the Class Period,[1] the presentation and content of these disclosures have changed over time:

**Plan Selection Page.**  To upgrade, users may start the process b by going to one or more landing pages, the presentation of which have varied over the Class Period.  Lambert Depo. 59:19-60:15; 20:10-24; 22:13-23:19; 41:5-10, Commerson Decl. Ex. 2.  For example, on June 8, 2013, when Ingalls contracted for the Spotify Premium streaming music service, Ingalls had a choice of either an "Unlimited" plan for $4.99/month or the "Premium" plan for "$9.99 a month."  Ingalls Depo. 77:9-12; 102:3-17; Commerson Decl. Ex. 4.  He expressly chose the "Premium" plan for $9.99/month by clicking "Try Premium."  *Id*. at 102:3-17; Ex. 4.  Other users, such as Hong, first

---

[1] Plaintiff excludes from his proposed class different Spotify services such as the Family Plan and Student Plan, which had different purchase flows and pricing.  Mtn. at 3, n.7.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 3:16-cv-3533 WHA
4851-7906-5674v.8 0098755-000014

arrived at a landing page that allowed them to upgrade to premium and stated, "Get 3 Months of Spotify Premium for only $0.99."  Hong Depo. 85:15-86:21, Commerson Decl. Ex. 15.

**Payment Selection Page.**  Once users decide to upgrade to Premium, they are presented with a page where they can select their preferred payment method.  Hong Depo. 25:20-26:1; Ingalls Depo. 103:23-105:14.  When Ingalls selected "Try Premium," the website asked him to log in to an existing Spotify account or to create a new account.  Ingalls Depo. 102:3-17.  After logging in, Ingalls reached a screen allowing him to select a method of payment for Spotify Premium.  Whitehead Decl. ¶ 7, Ex. 1; Ingalls Depo. 103:23-105:14; Commerson Decl. Ex. 5.  Under "Try Spotify Premium for 30 days!," the screen disclosed that the subscriber would receive the first 30 days of Spotify Premium free and that "[i]f you don't wish to continue enjoying Spotify Premium after your trial, simply cancel before the trial ends and no charges will apply.  Learn more."  *Id.*; *see also* Ex. G to Plt.'s Mot. at 2.  "Learn more" was hyperlinked to the Spotify's 30-Day Free Trial Terms and Conditions.  *Id.*  Ingalls does not remember this language, but admitted he likely decided not to read it.  Ingalls Depo. 104:2-106:7.

On November 27, 2013,[2] the language on the payment selection page was changed to state, "[i]f you don't cancel before the end of the trial, your credit card will automatically be charged for each subsequent month, until you cancel. Simply cancel before the trial ends and no charges will apply.  See the Terms and Conditions."  Ex. G at 3.  "Terms and Conditions" was hyperlinked to the Offer Terms & Conditions.  *Id.*  Further, after August 13, 2014, the language on the page was changed yet again to read, "[w]ith an on-going monthly subscription you'll be charged each month after your trial ends."  *Id.* at 4.

**Payment Information Page.**  After selecting a payment method, users must enter their payment information.  At the start of the proposed Class Period, the payment information page contained an auto-renewal disclosure just above a "Confirm payment" button (*see* Ex. G at 5, 7), which was presented to Mr. Ingalls when he registered for Spotify Premium:

> If you do not cancel your subscription before the end of the free trial the credit card you provide will automatically be charged the Spotify Premium subscription fee of US $9.99 (plus applicable taxes) per month, until you cancel.

[2] The dates in this section regarding changes to Spotify's Web site are approximate.

> You can cancel at any time by logging into your Spotify account and follow the cancellation instructions. No refunds or credits for partial monthly subscriptions period. For complete terms and conditions, please see our Terms of Service.

Whitehead Decl. ¶ 7, Ex. 3; Ingalls Depo. 113:20-114:11; Commerson Decl. Ex. 7.   This text was set apart from the rest of the screen in a yellow box, as shown below:



*Id.*  Even though this disclosure appeared immediately above the "Confirm payment" button, Ingalls does not believe he read it—despite admitting the text was easy to read.  Ingalls Depo. 116:15-20; 118:14-21; 118:23-119:23; 120:15-19.  Ingalls entered his credit card information and clicked "Confirm Payment."  Whitehead Decl. ¶ 7.

On November 14, 2013, this disclosure changed:  the phrase "Terms of Service" in the above text became a hyperlink leading to Spotify's 30-Day Free Trial Terms and Conditions.  *Id.*

On March 13, 2014, the "Confirm payment" button was changed to "START PREMIUM," and the disclosure was revised to state a date-certain when charges would begin:



Mr. Hong saw this version when he first registered for Spotify Premium on December 29, 2014. Whitehead Decl. Ex. 6; Hong Depo. 87:9-17; Commerson Decl. Ex. 16.[3]

---

[3] Although Mr. Hong selected PayPal as his payment method, which brings him outside Ingalls' proposed class, a putative class member purchasing via credit or debit card at the same time would have seen the same screen.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 3:16-cv-3533 WHA
4851-7906-5674v.8 0098755-000014

**Offer Terms and Conditions.**  Until August 13, 2014, the payment selection page contained a link to the Terms and Conditions for the offer.  For example, the payment selection page presented to Ingalls linked to the 30-Day Free Trial Terms and Conditions, which provided, in relevant part:  "If you decide that you do not want to become a paying user of the Spotify Premium Service upon the lapse of the Free Trial Period, you have to terminate your Premium Service (instructions for this can be found at //www.spotify.com/us/help/faq/payment/how-can-i-cancel-my-subscription/)) by the end of the Free Trial Period."  Whitehead ¶ 7, Ex. 2; Ingalls Depo. 109:7-17; Commerson Decl. Ex. 6.

Starting on November 14, 2013, the payment information page *also* linked to the Terms and Conditions for the particular offer.  For example, the payment information page presented to Mr. Hong linked to the Offer Terms and Conditions, which provided, in relevant part:

> [A]t the end of your Introductory Trial Period, you will automatically become a paying user of the Spotify Premium Service at the regular Spotify Premium monthly price, and the payment method you provided will automatically be charged the Spotify Premium subscription fee each month, until you cancel your Premium Service subscription.

Whitehead Decl. Ex. 7; Hong Depo. 91:22-92:12; Commerson Decl. Ex. 17.

**Website Confirmation.**  Once users complete their purchase of Spotify Premium, they are presented with a website confirmation page.  From the start of the Class Period until March 26, 2014, the confirmation page appearing on the user's screen after completing the transaction listed the product purchased and stated an email receipt would be sent to the user.  Ex. G at 10.  Thus, when Ingalls completed his purchase, the website displayed a receipt on the screen containing this information.  Whitehead ¶ 8, Ex. 4; Ingalls Depo. 120:23-121:22; Commerson Decl. Ex. 8.  After December 13, 2013, and through March 26, 2014, the confirmation page stated the subscription would "be automatically renewed" every month for the monthly fee, unless "you cancel your recurring payment" or unless "you cancel before that time."  Ex. G at 10-11.  After March 26, 2014, users, like Mr. Hong, were presented with a confirmation page disclosing when the trial ended, a user could cancel anytime, and the $9.99 monthly cost after trial.  Ex. G at 17-18.

**Email receipt.**  Spotify also sends users an email receipt at the email address provided during the registration process.  From the start of the proposed Class Period through June 2013,

the email, such as the email sent to Ingalls, linked to the Spotify's 30-Day Free Trial Terms and Conditions, where the user could find the auto-renewal information and cancellation instructions. Ingalls Depo. 120:23-121:22; 128:12-18; Commerson Decl. Ex. 9.

From June 2013 through December 2014, Spotify added language to the receipt stating that "[a]t the end of the free trial the payment card you provide will automatically be charged the Spotify Premium subscription fee of $9.99 (plus applicable taxes) per month."  Ex. G at 16.  From about December 2014 until the present, the disclosures in the email have depended on the specific offer being purchased, but all include auto-renewal language. Ex. G at 25-35.  For example, Mr. Hong received an email confirmation stating:

> You've authorised Spotify to charge you automatically every month, until you cancel your subscription.  You may cancel your subscription at any time by logging into your Spotify account at https://www.spotify/com/account/subscription and following the instructions.

Whitehead Decl. Ex. 10; Hong Depo. 104:24-105:11; Commerson Decl. Ex. 19.

**B.     Gregory Ingalls' Background and Use of Spotify Premium.**

Ingalls has completed 7 ½ years of higher education and has a master's in architecture. Ingalls Depo. 187:21-23;188:11-13. From 2011 to 2014, Ingalls co-owned and operated a "purely online, e-commerce" business that processed "100 to 200" consumer credit card transactions. Ingalls Depo. 14:14-23; 20:4-21.

Ingalls used Spotify's Premium service for "three to eight hours daily" during the first two weeks of the 30-day free trial.  Ingalls Depo. 131:10-132:24.  On July 8, 2013, after the 30-day free trial expired, Spotify first charged Ingalls' credit card $9.99 for his Spotify Premium account. *Id.* 77:13-16.  He continued to be charged $9.99 monthly until September 17, 2013, when he canceled his Premium subscription.  *Id.* 77:19-21; 176:17-23.  Ingalls testified he did not realize he was being automatically charged until months after the trial expired, when he checked his credit card for the first time.  *Id.* 136:2-12.  But he admitted he could have used the Premium service until he canceled, and received the benefits of access to advertisement-free music.  *Id.* 150:25-151:12.  After cancelling, he never requested a refund from Spotify.  *Id.* at 153:5-9.

## C.      Spotify's Terms and Conditions.

Each method through which a person could become a registered Spotify user required acceptance of Spotify's T&C to complete the registration.  Lambert Decl. ¶ 5.  The T&C explained that Spotify's Premium service automatically renews, how a customer could cancel, and that there would be no refunds of partial monthly subscriptions.  For example, the T&C in effect when Ingalls signed up in June 2013, explained:

> For some Trials, we'll require you to provide your payment details to start the Trial. At the end of such Trials, we may automatically start to charge you for the Premium Service on the first day following the end of the Trial, on a recurring monthly basis. By providing your payment details in conjunction with the Trial, you agree to this charge. If you do not want this charge, you must change your Subscription to the Free Service through your Spotify account's settings before the end of the Trial.

Lambert Decl. ¶ 7 Ex. 2  (Dec. 18, 2012 T&C).  The T&C also explained:

> If you have a Paid Subscription, your payment to Spotify will automatically renew at the end of the subscription period, unless you cancel your Paid Subscription through your **subscription** page before the end of the current subscription period. The cancellation will take effect the day after the last day of the current subscription period, and you will be downgraded to the Free Service. However, if you cancel your payment and/or terminate the Terms after the Cooling-off Period is over (where applicable), and/or before the end of the subscription period, we will not refund any subscription fees already paid to us.

*Id.*  "Subscription" was a different color and linked directly to a user's subscription page.  The current T&C, which all users of both the free and Premium service had to accept to continue using Spotify's services after September 9, 2015, made the auto-renewal language, cancellation policy, and refund policy even more prominent:

> For some Trials, we'll require you to provide your payment details to start the Trial. AT THE END OF SUCH TRIALS, WE MAY AUTOMATICALLY START TO CHARGE YOU FOR THE APPLICABLE PAID SUBSCRIPTION ON THE FIRST DAY FOLLOWING THE END OF THE TRIAL, ON A RECURRING MONTHLY BASIS. BY PROVIDING YOUR PAYMENT DETAILS IN CONJUNCTION WITH THE TRIAL, YOU AGREE TO THIS CHARGE USING SUCH PAYMENT DETAILS. IF YOU DO NOT WANT THIS CHARGE, YOU MUST CANCEL THE APPLICABLE PAID SUBSCRIPTION THROUGH YOUR SPOTIFY ACCOUNT'S SUBSCRIPTION PAGE OR TERMINATE YOUR SPOTIFY ACCOUNT BEFORE THE END OF THE TRIAL. IF YOU DO NOT WANT TO CONTINUE TO BE CHARGED ON A RECURRING MONTHLY BASIS, YOU MUST CANCEL THE APPLICABLE PAID SUBSCRIPTION THROUGH YOUR SPOTIFY ACCOUNT'S SUBSCRIPTION PAGE OR TERMINATE YOUR SPOTIFY ACCOUNT BEFORE THE END OF THE RECURRING MONTHLY PERIOD. PAID SUBSCRIPTIONS CANNOT BE TERMINATED BEFORE THE END OF THE PERIOD FOR WHICH YOU

1
2

HAVE ALREADY PAID, AND EXCEPT AS EXPRESSLY PROVIDED IN THESE TERMS, SPOTIFY WILL NOT REFUND ANY FEES THAT YOU HAVE ALREADY PAID.

3

*Id.*, Ex. 1.  The T&C also explains to users how to cancel and explains, again, that if they cancel

4

"before the end of the current subscription period, [Spotify] will not refund any subscription fees

5

already paid to us." *Id.*, Ex. § 15.  Throughout the Class Period, the then-current versions of

6

Spotify's U.S. Terms and Conditions have been available on Spotify.com and accessible by

7

several paths, including the Legal link in the bottom left corner of the web page.  *Id.* ¶ 6.

8

**D.      Spotify's Easy-to-Use Cancellation Mechanism.**

9

Spotify users can cancel their subscription at any time by logging in and going to their

10

"Subscription page."  Ingalls Depo. 155:14-156:3; Commerson Decl. Ex. 10.  Under "Subscription

11

and payment," a user can click on "cancel your subscription."  Users can then click "CANCEL

12

MY SUBSCRIPTION."  To complete the cancellation, the user enters his password and clicks

13

"CANCEL SPOTIFY PREMIUM SUBSCRIPTION."  The user's subscription page then shows

14

the date the account will revert back to Spotify's free ad-based service.  Neither plaintiff had any

15

trouble canceling their accounts, and the cancellation instructions were easy for them to follow.

16

Hong Depo. 101:22-102:6; Ingalls Depo. 143:5-18; 156:12-16.

17

In 2013, when Ingalls subscribed to the Premium service, users could also check when

18

their accounts would auto-renew and access information about canceling by going to "Account"

19

then "Subscription."  Ingalls Depo. 158:17-160:11; Commerson Decl. Ex. 11.  Information about

20

the date and method of payment for their autorenewal was also available under the "Overview" tab

21

on the "Account" page.  Ingalls Depo. 160:24-161:20; Commerson Decl. Ex. 12.  Current

22

subscribers can access this information under the "Account overview" tab and "Subscription" tab

23

on their "Account" page.  Ingalls Depo. 161:21-163:17; Commerson Decl. Exs. 13-14.

24

**III.      PLAINTIFFS' CLAIMS AND THE PROPOSED CLASS**

25

Plaintiffs allege Spotify's offering of its Premium subscription streaming service violates

26

the APRL, Business & Professions Code §§ 17600-17606.  Ingalls' Motion for Class Certification

27

narrows the proposed class in the Amended Complaint—which asserted a nationwide class of all

28

subscribers to Spotify Premium—to include only California users who [a] "signed up for Spotify

8

Premium on spotify.com [b] through either a '3 months  for a reduced price' or '30-day free trial' offer, [c] selected a credit or debit card payment method, and [d] whose credit or debit card was subsequently charged $9.99 after the expiration of the offer term." Mtn. at 1.  Ingalls also proposes a subclass of users who "signed up for Spotify Premium on spotify.com through either a '3 months for a reduced price' or '30-day free trial' offer, selected a credit or debit card payment method, and whose credit or debit card was subsequently charged $9.99 at least twice after the expiration of the offer term, who subsequently cancelled their subscription." *Id.*

Ingalls claims Spotify violated the APRL by allegedly failing to do four things required by the APRL: (1) to obtain affirmative consent to the subscription agreement; (2) to clearly and conspicuously disclose that the recurring charge would be automatically charged to the user's credit card; (3) to disclose Spotify may change the amount of the recurring charge; and (4) to provide a receipt stating that no partial refunds would issue upon cancellation.  Mtn. at 5-8. Plaintiff alleges the omissions were uniform during the Class Period, and asserts class certification is therefore appropriate.  *Id.* at 14-16.

Ingalls' motion rests on a fundamentally erroneous understanding of the UCL.  According to Ingalls, any user who proves a violation of the APRL is entitled to a refund under the UCL without regard to the user's individual circumstances—even if the user understood he was getting an automatically renewing monthly subscription and fully took advantage of that subscription. But in fact, the UCL allows restitution ***only*** where a person has suffered loss because of the allegedly unfair competition (in this case, the alleged violation of the APRL).  As a result, even if Ingalls could demonstrate a violation of the ARPL's disclosure requirements, any particular Spotify user's right to relief would turn on individual proof as to whether that user got what he or she wanted.  Thus, the Court should deny class certification.

## IV.   LEGAL ARGUMENT

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.  To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotations and marks omitted).  "A party seeking

9

class certification … must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." to satisfy Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The Rule does not "establish an entitlement to class proceedings for the vindication of statutory rights" but "imposes stringent requirements for certification that excludes most claims."  *Am. Ex. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2307 (2013).  Further, the Court must conduct a "rigorous analysis" of the Rule 23 prerequisites before deciding whether to certify a class.  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351; *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 509 (9th Cir. 1992) (same). The Court must look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the class certification issues."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

A plaintiff bears two "strict" burdens for class certification.  First, a plaintiff must present evidence satisfying all four prerequisites set forth in Rule 23(a).  Second, a plaintiff must show the case falls into one of the three categories of cases Rule 23(b) defines as appropriate for class action treatment.  *See*, *e.g.*, *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

**A.** **Ingalls' Claims Are Atypical, and He Is An Inadequate Representative.**

The typicality and adequacy elements of Rule 23(a) ensure absent class members will be protected by vigilant representatives whose interests are aligned with theirs.  *See, e.g.*, *Hanon*, 976 F.2d at 508.[4]  Every "class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Falcon*, 457 U.S. at 156 (quotation omitted). Typicality is absent "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch*, 903 F.2d 176, 180 (2d Cir. 1990)); *see Hanon*, 976 F.2d at 508.

---

[4] There is "considerable overlap" between Rule 23(a)'s typicality and adequacy requirements. *Murray v. Sears, Roebuck and Co.*, 2014 U.S. Dist. LEXIS 18082, *32-33 (N.D. Cal. 2014).

1

2

### 1.    The Substantial Individual Standing Defense to Ingalls' Claims Means He Is Not an Adequate or Typical Class Representative.

Ingalls summarily asserts he meets the typicality requirement because his claims "arise from the same practice and course of conduct" as putative class members' claims (Mtn. at 16), but the Motion ignores his actual experience in purchasing Spotify Premium.  As set forth in Spotify's motion for summary judgment (Dkt. 80), Ingalls lacks standing to pursue his claims.  In particular, Ingalls has testified he neither read nor relied on Spotify's purchase disclosures and received what he paid for.  The issues raised by Ingalls' testimony, as well as other facts specific to Ingalls' circumstances, render him an inadequate and atypical class representative.

#### a.    Ingalls' Standing Problems Render Him Atypical.

A plaintiff has standing to proceed under the UCL only if he "has suffered an injury-in-fact [and] 'has lost money or property' as a result of the defendant's alleged conduct." *Anderson v. Jamba Juice Company*, 2012 U.S. Dist. LEXIS 120723, at *11 (N.D. Cal. 2012) (citations omitted) (quoting § 17204 and Civ. Code § 1780(a)).  Where, as here, the "unfair competition" underlying the UCL claim rests on a defendant's omission, a plaintiff must show ***actual*** reliance, i.e., he suffered an economic injury ***as a result of relying on*** the alleged omission.  *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1047-48 (N.D. Cal. 2014).

Ingalls alleges four violations of the APRL, but lacks standing to seek damages based on any of them.  Most notably, he did not read Spotify's recurring payment disclosures before signing up—even though he admits he ***could*** have read those disclosures and would have understood his credit card would be auto-renewed had he done so.  (Ingalls Depo. 116:15-20; 120:15-19; 114:22-115:20; 118:14-21; 114:22-115:20; 115:21:116:7; 118:23-119:23.)  Because Ingalls decided to pay for the service without reading the disclosures at all, any alleged deviation by Spotify from the APRL, such as a purported failure to obtain affirmative consent or to clearly disclose the recurring charge, had no effect on his decision—and therefore could not have caused  his alleged injury.

Based on both plaintiffs' inability to show they lost money ***because of*** any of the practices they challenge, Spotify has moved for summary judgment.  *See* Dkt. No. 80.  But even if Ingalls were to defeat the motion by showing a disputed issue of fact, the individual defense of a lack of

11

standing would "threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. Further, if a class were certified, and Ingalls then lost at trial based on his inability to prove standing on an individual basis, absent class members' claims would be prejudiced. Because Ingalls might lose the case on grounds not applicable to the class as a whole, he cannot be a representative.

This Court made this very point in *Deitz v. Comcast Corp.*, 2007 U.S. Dist. LEXIS 53188 (N.D. Cal. 2007), where plaintiff Deitz sued his cable company because it allegedly charged him for equipment he did not "affirmatively request." *Id.* at *4. Like Ingalls, Dietz admitted he had not "read [defendant's] policies and practices notice, the welcome kit, or even many of his bills," which were "the very documents plaintiff claims were misleading to [defendant's] subscribers." *Id.* at *12-13. His failure to read the disclosures subjected him "to a unique defense that he did not read, and thus could not have relied on, any of the misstatements." *Id.* at *13. Because his unique circumstances "could skew the focus of the litigation," he was atypical. *Id.* (internal cite omitted); *see also English v. Apple Inc.*, 2016 WL 1188200, at *12 (N.D. Cal. 2016) (plaintiff who "did not view or rely on the terms and conditions in making her purchase" was "an inadequate and atypical class representative" to assert claim based on alleged omissions in terms); *McKinnon v. Dollar Thrifty Auto. Grp.*, 2016 U.S. Dist. LEXIS 154386, *29 (N.D. Cal. 2016) (plaintiff atypical where she "could not 'demonstrate that the absence of such disclosures caused her purported injury.'").

**b.      Ingalls' Unique Background and Experience Render Him Atypical.**

Ingalls' unique background and experience exacerbate the danger that his failure to read the disclosures could "skew the focus of the litigation." *Deitz*, 2007 U.S. Dist. LEXIS 53188 at *13. Ingalls has completed 7 ½ years of higher education and works as an architect, Ingalls Depo. 187:21-2, a profession in which attention to detail and careful review of information are "extremely" important. *Id.* 188:23-25, 189:9-12. In addition, Ingalls has atypical personal and commercial expertise in providing and accepting user terms and conditions that undermine his own claim. When Ingalls signed up for Spotify's service in June 2013, he co-owned and operated a "purely online, e-commerce" business that processed "100 to 200" consumer credit card transactions. *Id.* 14:14-23; 20:4-21. The site contained terms and conditions that were binding on his customers. *Id.* 18:5-12; 20:4-21:1; 30:17-21. Having populated terms and conditions for his

12

own site, Ingalls admitted he understood that by using Spotify's service, he was agreeing to terms and conditions hyperlinked on Spotify's site. *Id.* 68:21-69:2. Ingalls further testified his Web site's purchase pages contained legal disclosures to "establish [his] customers were authorizing the transactions" so they "couldn't claim they didn't buy" the products. *Id.* 31:10-32:10; 32:25-34:8.

Ingalls' uniquely sophisticated commercial experience also negates his subjective excuse that if the auto-renew disclosure had been "presented in a more direct fashion," he would have read them. Mtn. at 18. In facts, Ingalls admits his choice not to read the terms of Spotify's offer reflected his usual practice and did ***not*** depend on whether the disclosures were "presented in a ... direct fashion": he signed up for myriad automatically renewing subscriptions ***without reading or understanding the terms***. Ingalls Depo. 116:22-117:17 (Q: "For most of [the other automatically renewing services you purchased], did you sign up without understanding or reading the terms? A: Correct."); *Id.* 117:18-118:12. Absent class members who are more diligent than Ingalls would be prejudiced if he served as their class representative.[5]

### 2. Ingalls Cannot Represent Class Members Who Were Exposed to Different Disclosures.

Even assuming Ingalls had standing to pursue his individual claim, he could not represent class members who were exposed to different disclosures. Ingalls' experience differed materially from class members who purchased Premium in later years. The auto-renewal disclosures, the language on the button used to complete the transaction ("Confirm Payment" vs. "Start Premium"), and the email receipts all changed—in ways a fact-finder might find significant. *See* Section II.A; *compare* Whitehead Decl. Ex. 2 *with* Ex. 6 and *compare* Commerson Decl. Ex.9 *with* Ex. 19. Although Spotify intends to establish that all disclosures and emails during the Class Period were APRL compliant, these variations make it impossible for Ingalls to resolve the validity of disclosures in a single stroke, as Rule 23 requires. *See Dukes*, 564 U.S. at 350.

---

[5] Spotify will also argue Ingalls' claim is time-barred by the 1-year limitation provision in the Terms and Conditions. Lambert Decl. ¶ 6, Ex. 1 § 24.3.4. The Court found that clause to be unconscionable when it declined to enforce the arbitration provision. Dkt. 39. But Spotify has appealed that finding because, with due respect, it believes California law supports enforcement of contractual limitations periods. Dkt. 44. Should the Ninth Circuit reverse on this point, Ingalls will be subject to yet another defense not generally applicable to the proposed class.

Ingalls dismisses these variations, focusing solely on what was allegedly omitted in violation of the APRL.  But at trial, the Court will need to assess the effect of alleged omissions in the context of the information provided.  This case thus resembles *Berger v. Home Depot*, 741 F.3d 1061, 1066 (9th Cir. 2014), in which plaintiff sought certification of claims arising out of a damage waiver in defendant's rental agreement.  Different versions of the agreement "discussed the damage waiver in a different way," and plaintiff sought certification of different subclasses to address each version.  But because plaintiff had a transaction under only one version, he was "not a member" of the other two subclasses and "cannot prosecute claims on their behalf."  *Id.* at 1067.[6]  So, too, here:  Ingalls cannot litigate the validity of disclosures not used in his transaction.

### 3. Ingalls is an Inadequate Class Representative Because He Was Recruited by Class Counsel, and Is Neither Informed nor Actively Monitoring the Case.

Ingalls is inadequate because he is not independent, informed, or actively monitoring the case.  "One of this Court's duties 'is to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney.'"  *Alberghetti v. Corbis Corp.,* 263 F.R.D. 571, 580 (C.D. Cal. 2010) (citation omitted).  The Court should "refuse to certify class actions in which the named plaintiff is 'simply lending his name to a suit controlled entirely by class attorney.'"  *Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, at *2-3 (N.D. Cal. 2007) (class certification denied where it was clear "that plaintiff's counsel, and not plaintiff, is the driving force behind this action"); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 309 (N.D. Cal. 2010) (*Bodner* applies where record suggests the named plaintiff "was 'recruited'").

Here, Ingalls was recruited for the litigation by his girlfriend, an attorney for plaintiffs' law firm, Milstein Adelman & Wade (Ingalls Depo. 53:18-54:18), more than two-and-a-half years *after* his credit card was charged by Spotify. *Id.* 152:11-25.[7]  During that period, Ingalls neither

---

[6] *See Murray*, 2014 U.S. Dist. LEXIS 18082, at * 31-32 (plaintiff not typical where his purchase experience differed from members of proposed class); *In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012) (plaintiffs inadequate because they used a different process to contract with Facebook).

[7] Similarly, Hong received an unsolicited text message from an attorney he was friends with at the Milstein firm asking him if he had Spotify Premium.  Hong Depo. 73:13-74:2. Until he received that text, he had no interest in suing Spotify.  *Id.*  Unlike the cases cited by plaintiff (Mtn. at 17, n. 27), Ingalls is inadequate because he was both recruited ***and*** he has failed to exercise control or show an interest in this case.

complained to Spotify nor sought a refund.  After being contacted by his girlfriend, Ingalls did nothing to investigate Spotify's disclosures before suing—even though he had not read the disclosures during his transaction and the purported inadequacy of those disclosures formed the very basis for his claim.  Ingalls Depo. 151:24-152:9.  A plaintiff who sues first and asks questions later cannot be an adequate class representative.  *See Bodner*, 2007 WL 1223777, at \*2-3.

For similar reasons, a plaintiff who "fail[s] to exhibit an interest in supervising the attorneys in th[e] case" should not be designated a class representative.  *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (class representative inadequate where he apparently was "unfamiliar[] with the allegations in the amended complaint and the overall status of the proceedings"; "ceded control to his lawyers;" and was "unaware that his lawyers had filed an amended complaint"); *see also Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1462 (S.D. Cal. 1988) (class representative inadequate where he demonstrated "an inadequate knowledge of the circumstances underlying this suit").  Consistent with his disinterest in the genesis of his claims, Ingalls did not even review his complaint until April 2017, nearly a year after the action was filed, just before his deposition.  Ingalls Depo. 57:2-21; 59:12-15.  Nor has he followed the case in which he seeks to guard the interests of other Spotify users.  Most notably, he was not aware of the outcome of Spotify's motion to compel arbitration or the nature of the parties' discovery disputes. *Id.* 42:8-21; 43:5-15.  Nothing in Ingalls' performance to date suggests he would be an adequate representative for Spotify Premium subscribers.

**B.     Ingalls Cannot Establish Predominance, Commonality, or Superiority, Preventing Certification of the Proposed Rule 23(b)(3) Class**

Ingalls must also satisfy at least one subsection of Rule 23(b).  Here, he seeks certification of a damages class under Rule 23(b)(3).  Mtn. at 1.  Thus, he must show "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).[8]  Ingalls lists a number of common

---

[8] Contrary to Ingalls' assertion, Spotify has never conceded superiority.  Mtn. at 14.  In a discovery letter, Spotify's counsel said it was not contesting numerosity or ascertainability based on the class definition in plaintiff's amended complaint—a definition Ingalls has materially modified in his Motion.  Ex. F. at 3; Mtn. at 12.  In any event, Spotify has repeatedly made clear

questions of law in his Motion.  Mtn. at 15-16.  But "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'  This does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350.

"Rule 23(b)(3) requires a district court to formulate 'some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate.'" *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 593 (9th Cir. 2010) (quotation omitted), *rev'd on other grounds*, 564 U.S. 338 (2011).  Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *Wang v. Chinese Daily News,* 737 F.3d 538, 545 (9th Cir. 2013); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009).  "The overarching focus remains whether trial by class representation would further the goals of efficiency and judicial economy." *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 946 (9th Cir. 2009).

"If the main issues in a case require the separate adjudication of each class member's individual claim or defenses, a Rule 23(b)(3) action would be inappropriate." *Zinser*, 253 F.3d at 1189 (citation omitted).  A plaintiff does not carry his burden on predominance and superiority by showing a "common nucleus of facts"; rather, "[i]f each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Id*. at 1192 (affirming denial of class certification).  The analysis of commonality and predominance "begins … with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  "[T]he Court must identify the substantive issues raised by the cause of action and then inquire into the proof relevant to each issue." *In re Beer Distrib. Antitrust Litig*., 188 F.R.D. 549, 556 (N.D. Cal. 1998).

### 1.   Individual Questions Permeate the UCL Restitution Analysis, Barring Certification of UCL Claims for Monetary Relief.

Ingalls seeks restitution for the class based on alleged violations of the UCL, Bus. & Prof. Code § 17200 (Dkt. 17, ¶ 74).  As explained above, Ingalls seeks to pursue class claims for four omissions that allegedly violate the APRL: "(1) [failure to] disclose that the amount of the

---

that a class action would not be superior here because individual issues predominate.

recurring charge may change, (2) [failure to] clearly and conspicuously disclose that customers' payment cards will be automatically charged; (3) [failure to] obtain[] Class Members' affirmative consent to the [autorenewal terms], and (4) [failure to] provide a post-purchase acknowledgment containing (a) the full cancellation policy and (b) a description of the cancellation policy including partial monthly refunds." Mtn. at 14-15.

Ingalls assumes a class can be certified based on his allegation that Spotify made uniform disclosures. In fact, however, liability hinges on individual, subscriber-by-subscriber assessments of causation and injury. Further, leaving aside that principle, the record shows variations in the disclosures presented to members of the proposed class saw during the proposed Class Period.

### a.    Individualized Issues Exist With Respect to Injury Suffered.

The California Legislature enacted the APRL in response to reports that consumers "believed they were making a one-time purchase of a product, only to receive continued shipments of the product and charges on their credit card." Dkt. 76-2, Exh. A at 3. The APRL's purpose therefore was to protect consumers from ***unknowingly*** being charged for ***unwanted*** auto-renewing subscriptions without their ***consent***. As explained in Spotify's Motion for Summary Judgment, the APRL affords no independent private right of action. Instead, to assert a claim for violation of the APRL, a plaintiff must assert a claim under another statute or common law principle. Here, Ingalls sues under the UCL. As a result, both Ingalls and the absent class members he seeks to represent must satisfy the UCL's requirements of showing they have (1) suffered an injury-in-fact, and (2) lost money or property as a result of unfair competition. Dkt. 80 at 10-18.

This Court's decision in *Deitz*, 2007 U.S. Dist. LEXIS 53188, *20 (2007), illustrates the "subscriber-by-subscriber" inquiries required to recover here. There, the Court declined to certify a class of cable subscribers alleging they were charged for equipment without their affirmative consent because each "subscriber[] differ[ed] from each other in important respects":

> Here, it will be necessary to determine subscriber-by-subscriber whether even if Comcast revealed the fact that the equipment was not needed in a particular case, the subscriber would have rented the equipment anyway. ... Whether Comcast actually misled and harmed its subscribers cannot be determined on a class-wide basis because of the variety of possible reasons that a subscriber rented the equipment at issue. … [Subscribers who] would have rented the

equipment *whether or not Comcast had obtained their affirmative consent* [were not harmed.]

*Id.* at *20-21 (emphasis added).  The Court concluded it was "impossible to determine, on class-wide proof, whether all subscribers were harmed by Comcast's conduct" and that "[d]eciding whether these subscribers were harmed *at all* would predominate the litigation." *Id.* at *21-22.

Here, the testimony of Ingalls and Hong illustrates just a few of the many differences that would exist among class members.  Hong admitted he was not entitled to *any* refund because he wanted the service, understood it was auto-renewing, and was worth the price (Hong Depo. 63:9-13; 104:4-9; 101:14-21), Ingalls, on the other hand, claimed he was entitled to a refund not only of his initial monthly fee but also for the two subsequent recurring charges because he claims he stopped using the service in the first two weeks of his free trial (Ingalls Depo. 131:10-132:24).  As in *Deitz*, the Court could not determine on class-wide proof who was harmed by the alleged omissions; rather, resolution of the core issues will require testimony from each class member seeking a refund, to understand whether that class member was harmed at all.  *See* 2007 U.S. Dist. LEXIS 53188, at *20-22.

Courts decline to certify UCL restitution classes "where … the majority of the class members were not harmed by the alleged wrongful conduct, and where individualized inquiries would be necessary … to determine appropriate restitution." *Campion v. Old Republic*, 272 F.R.D. 517, 533 n. 4, 537 (S.D. Cal. 2011).  Further, damages must be "'capable of measurement on a classwide basis," in the sense that the *whole class* suffered "damages attributable" *to the same injurious conduct underlying the plaintiffs' legal theory*. *Comcast Corp.*, 133 S. Ct. at 1433 (2013).  The proposed damages model must measure only the damages attributable to the theory of liability.  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).  Here, because one cannot determine on a class basis who suffered "damages attributable" to the injurious conduct underlying the plaintiffs' legal theory, *Comcast Corp.*, 133 S. Ct. at 1433, Ingalls cannot satisfy the exacting set forth by the Supreme Court.

Ingalls seeks to sidestep this deficiency in his class claims by making the familiar argument that "damages calculations alone cannot defeat certification."  Mtn. at 21 (citing *Pulaski & Middleman, LLC v. Google*, 802 F.3d 979, 986 (9th Cir. 2015)).  But courts apply this principle

in cases "where there exist[s] a common methodology for calculating damages," even though the amount recoverable may vary from class member to class member.  *Doyle v. Chrysler Grp, LLC*, 663 Fed. Appx. 576, 59 (9th Cir. 2016); *see, e.g., Pulaski & Middleman*, 802 F.3d at 989 ("Pulaski's principal method for calculating restitution employs Google's Smart Pricing ratio, which . . . set[s] advertisers' bids to the levels a rational advertiser would have bid if it had access to all of Google's data"); *Leyva*, 716 F.3d at 514 ("Medline's computerized payroll and time-keeping database would enable the court to accurately calculate damages and related penalties for each claim.").  In those cases, "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated."  *Id.*

These cases have no bearing here.  The most obvious flaw in Ingalls' reasoning arises from the fact that the very issue of entitlement to restitution presents individual questions that cannot be resolved in a single stroke on behalf of the class.  Thus, Ingalls misframes the question when he argues that class restitution can take the form of "refund[ing] those monies which Defendant had no right (due to its violations of the APRL) to take or retain," Mtn. at 22, because the question whether Spotify has the right to "retain" subscription payments itself requires individual determination.  Put another way, the APRL has no automatic statutory penalty[9]; as a result, only those class members who ***unknowingly*** purchased an ***unwanted*** auto-renewing service ***because of*** Spotify's alleged omissions are entitled to restitution under the UCL.  Because plaintiff has failed to establish that all members of the proposed class are entitled to restitution or that, even for those who are, the measure of restitution is traceable to the violation, his damages model fails.  *See, e.g., Chowning v. Kohl's Dep't Stores, Inc.*, 2016 WL 1072129, *7 (C.D. Cal. 2016) (rejecting full remedy restitution model for UCL claim; "numerous district courts have held that consumers

---

[9] Ingalls does not rely on Bus. & Prof. §17603, which treats as an "unconditional gift" any "goods, wares, merchandise, or products" that a business "sends" to a customer under an automatic renewal provision "without first obtaining the consumer's affirmative consent."  As Ingalls tacitly recognizes, § 17603 "only applies to tangible goods or products."  *Mayron v. Google, Inc.*, 2016 Cal. Super. LEXIS 173, at *8 (Feb. 26, 2016) (provision did not apply to data storage service); *Johnson v. Pluralsight, LLC*, 2017 U.S. Dist. LEXIS 23294 (E.D. Cal. Feb. 17, 2017) (provision did not apply to online video subscription service); it therefore does not reach Spotify's streaming service at all.  Further, it "is only intended as a shield against a seller seeking payment for a good sent in violation of the Automatic Renewal Law; it is not intended to authorize a consumer to bring an action."  *Mayron,* 2016 Cal. Super. LEXIS 173, at *8.

alleging mislabeling or deceptive advertising are not entitled to a full refund where the challenged product conferred some benefit notwithstanding the false advertising"); *Russell v. Kohl's Dep't Stores, Inc.*, 2015 WL 12748629, at *7 (C.D. Cal. 2015) (*Pulaski* "inapposite because Plaintiffs here have not met their burden to present a viable damages model," presenting instead "an array of potential economic models in a cursory fashion without any detailed explanation.").

### b.    Individualized Issues Exist Regarding Causation and Reliance.

Restitution is available under the UCL only to restore money or property a plaintiff has lost "because of" unfair competition.  In cases involving omissions or misrepresentations, this requires a showing of actual reliance.  *Backhaut*, 74 F. Supp. 3d at 1047.  Ingalls' motion ignores causation altogether, assuming he can assert a class based on a common legal issue merely by alleging a UCL violation.  But even assuming Spotify's liability under the UCL prong were subject to common proof, "[w]hether individual class members are entitled to recover on the basis of this liability is not."  *Webb v. Carters, Inc.*, 272 F.R.D. 489, 503 (C.D. Cal. 2011).

Similarly, restitution based on unfair sales practices requires proof of causation.  *Backhaut*, 74 F. Supp. 3d at 1047 (N.D. Cal. 2014) (for UCL claim based on omission, plaintiff must have actually relied on omission, and suffered economic injury *as a result of that reliance*, to have standing to sue") (emphasis added)).  "[O]ne who was not exposed to the alleged misrepresentation and therefore could not possibly have lost money or property as a result of the unfair competition is not entitled to restitution."  *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 631 (2010).  Further, "[i]f the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified."  *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014) (citation omitted).

Here, Ingalls does not even argue for an inference of classwide reliance, and presents no evidence that subscribers are likely to be deceived because of the omissions at issue.  Indeed, the record shows the opposite is true:  Hong and Ingalls admit they had no trouble reading the language in the text box immediately above the confirmation payment button, and they agree that language made clear the service would automatically renew.  Ingalls Depo. 116:15-20; 120:15-19;

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 3:16-cv-3533 WHA
4851-7906-5674v.8 0098755-000014

118:14-21; 114:22-115:20; 115:22-116:7; Hong Depo. 88:13-89:7; 90:7-19; 103:15-20.  Similarly, they admit they also would have known the service auto-renewed had they read other disclosures on the website presented during the payment process (*id.*; *see also* Ingalls Depo. 68:6-70:10; 110:24-111:22; Hong Depo. 106:5-12), Spotify's Terms and Conditions (Ingalls Depo. 165:15-167:9; Hong Depo. 123:9-124:24; 125:19-127:12), or their account page.  Ingalls Depo. 158:17-160:11; 160:24-161:20.  A court cannot resolve reliance or causation on a classwide basis where users have access to, and could have read, disclosures that could negate the effect of an alleged omission.  *E.g., Philips v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 177672, *55 (N.D. Cal. 2016) (denying certification of omission claim based on failure to disclose dangers in vehicle steering system, because some class members could have read warnings in their owner manuals.)

Even if plaintiffs' failure to read Spotify's disclosures were not dispositive, the actual effect of any alleged omissions in the disclosures would vary by plaintiff.  Hong testified he could not remember reading the disclosures but still understood Spotify's service was auto-renewing when he signed up; he complained only because he forgot the date his free trial would end and believed Spotify should have sent a reminder.  Hong Depo. 59:21-60:10, 63:9-13, 88:13-89:7, 90:7-19, 103:15-20, 112:23-113:2.  Ingalls, in contrast, said he did not know the service was auto-renewing, bizarrely claiming he believed Spotify requested his credit card only as "proof of [his] age" so he could "listen to music with swear words."  Ingalls Depo. 121:23-122:21.

This conflicting testimony—which would proliferate among class members—makes it impossible to determine on a class basis whether class members unwittingly subscribed to an auto-renewing service.  This Court made the same point in *Fields v. Mobile Messengers Am., Inc.*, 2013 WL 6073426, at *2 (N.D. Cal. Nov. 18, 2013), where the Court denied certification of a TCPA class action because plaintiffs "failed to meet their burden to prove that the issue of consent can be addressed with class-wide proof … because [their theory] merely speculates, without any actual evidence, that mass fraud *may* have occurred."   Here, the issue whether Spotify's subscribers consented to auto-renewal could not be resolved with classwide proof.  Rather, to determine if the allegedly defective disclosures caused injury, the Court would need to inquire whether each class member understood she was consenting to an auto-renewed service when she signed up.

21

Ingalls' trial plan highlights his effort to gloss over the inevitable variations in subscriber impact. According to Ingalls, he intends to try his case by presenting his own testimony, Spotify's testimony, and Spotify's disclosures "to demonstrate Spotify violated the APRL in omitted information[.]" Mtn. at 24. "Once the Court determines Spotify violated the APRL and/or UCL, it will then determine what remedies are available." *Id.* But this plan omits any effort to present evidence of how, or even whether, Ingalls (or any other class member) was injured by the violation. In contrast, ***Spotify's*** trial plan requires calling every absent class member to find out if she understood she was subscribing to an auto-renewed service, whether she used the service, and whether she got what she expected, based on the disclosures she saw. If the absent class members respond they did, they are not entitled to restitution under the UCL, under settled law. Because the separate adjudication of each class member's individual claim would be required, the "economy and efficiency of class action treatment [would be] lost." *Zinser*, 253 F.3d at 1189.

### c. Individualized Issues Exist Regarding Spotify's Defense of Voluntary Payment.

Spotify asserts the voluntary payment doctrine as an affirmative defense. *See* Answer, Dkt. 49, Aff. Def. 14. The doctrine "bars the recovery of money that was paid with full knowledge of the facts." *Parino v. Bidrack, Inc.*, 838 F. Supp. 2d 900, 908 (N.D. Cal. 2011) (citing *Am. Oil Serv. v. Hope Oil Co.*, 194 Cal. App. 2d 581, 586 (1961)). "[N]umerous courts have found that the predominance requirement is not satisfied where class claims are subject to a unique defense under the voluntary payment doctrine." *Spagnola v. Chubb*, 264 F.R.D. 76, 98 (S.D.N.Y. Jan. 7, 2010) (collecting cases). For example, in *Endres v. Wells Fargo Bank*, 2008 WL 344204 (N.D. Cal. 2008), plaintiff sought to represent a putative class of customers alleging defendant failed to disclose it would charge overdraft fees when it opened their accounts. The court found the "applicability of the voluntary payment" defense defeated predominance because it would require an individualized analysis, barring claims "by class members who continued to incur and voluntarily pay the . . . fees." *Id.* at *12. Other courts reach similar conclusions.[10]

---

[10] *See, e.g., Gawry v. Countrywide Home Loans Inc.*, 640 F. Supp. 2d 942, 957 (N.D. Ohio 2009) ("individual inquiries would be required to explore whether the benefits received by putative class members rendered payment of the prepayment penalty voluntary"); *Spagnola*, 264 F.R.D. at 99 (denying certification where insurer allegedly breached form contract regarding policy renewals

Here, Hong admitted he continued to pay for the Spotify service and enjoy its benefits after he was aware of the recurring charge. Hong Depo. 59:21-60:10; 63:9-13; 104:4-9; 101:14-21. Like Hong, most proposed class members knew exactly what they were purchasing, as Hong did, particularly where, as here, the proposed class includes customers who *subscribed, used, and paid for* Premium for consecutive months and years. The defense would require individualized inquiry and would likely resolve many users' claims.

### d.   Individualized Issues Exist Regarding Class Members' Awareness and Use of Spotify's Refund Policy.

Ingalls alleges Spotify failed to "provide an acknowledgment that includes the … cancellation policy … in a manner that is capable of being retained by the consumer" (Mtn. at 8, citing B&P Code §§ 17601(b)(2), 17602(a)(2)), because the receipts issued to customers did not disclose that customers who cancelled in the middle of their monthly subscriptions would not receive prorated refunds.[11] He asserts a subclass to pursue this claim, Mtn. at 12, but this subclass suffers from the same individualized issues as the larger class.

Customers who cancelled Spotify's service in the middle of a subscription could continue using the service for the remaining days they had paid for, as Hong was aware and exploited "because he'd already paid for it." Hong Depo. 108:10-15. Those who continued to use the service after cancelling necessarily would be owed nothing for the remainder of the month, but plaintiff's restitution theory fails to account for this inquiry. Further, Spotify informed customers immediately above the button to complete the purchase, and in similar language in the T&C, that "no refunds or credits for partial monthly subscriptions period" would be provided. Customers who read that disclosure would have no expectation of (or right to) a partial refund under UCL restitution principles. Because an individualized inquiry is necessary to determine whether each

---

because it would require determination if each class member "knew or should have known of the circumstances surrounding the increases in their respective coverages but continued to pay."); *see also Lopez. v. Wash. Mut. Bank, F.A.*, 2002 U.S. App. LEXIS 24344, *9 (9th Cir. 2002) (affirming dismissal of claims where plaintiffs remained free to close or modify their accounts, and thus deposits made to cure a challenged overdraft charge were "voluntary payment[s].").

[11] Contrary to plaintiff's assertion, the APRL does not require businesses to provide their refund policy. Indeed, the disclosure of a refund policy is not referenced anywhere in the APRL or its legislative history. Nonetheless, Spotify disclosed that it did not provide partial refunds on the payment information page when users signed up, as well as in its Terms and Conditions.

23

class member relied on the omission or was injured by it, the class does not satisfy Rule 23(b)(3).[12]

## C.   Certification of a Rule 23(b)(2) Class Would Be Improper.

As an alternative, Ingalls tacks on a single paragraph at the end of the Motion seeking to certify a Rule 23(b)(2) class.  A Rule 23(b)(2) class is inappropriate because he lacks standing, monetary claims predominate, and the relief he is seeking is not sufficiently identified.

### 1.   Ingalls Lacks Standing to Seek Injunctive Relief.

Ingalls does not have standing to seek injunctive relief and therefore cannot represent a 23(b)(2) class.  A plaintiff must prove "a real and immediate threat that he would again" suffer injury to have standing for prospective equitable relief.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).  When a plaintiff no longer is subjected to the challenged practice, courts refuse to certify a Rule 23(b)(2) class.  Thus, in *Deitz*, this Court held that a former cable subscriber who challenged allegedly unauthorized charges lacked standing to seek injunctive relief because he could not demonstrate "a definitive likelihood that he will once again become a subscriber of defendants' cable services."  2006 U.S. Dist. LEXIS 94333, at *9.  "*Unless the named plaintiff is himself entitled to seek injunctive relief he 'may not represent a class seeking that relief*."  *Id.* at *10 (quoting *Hodgers-Durgin v. De La Vina,* 199 F.3d 1037, 1044 (9th Cir. 1999)) (emphasis in original).  Similarly, "if a plaintiff has knowledge of a defendant's practices, that plaintiff cannot have standing to seek injunctive relief to redress injuries caused by those practices, because the plaintiff's knowledge precludes him from showing a likelihood of being injured in the future by those practices."  *In re Intel Laptop Battery Litig.*, 2011 WL 7290487, *2 (N.D. Cal. 2011); *Becker v. Skype Inc.*, 2014 WL 556697, at *3 (N.D. Cal. 2014) (plaintiff could not show a

---

[12] Variations in disclosures over the Class Period would also present individual issues among class members, affecting whether class members relied on the omitted information in making their purchasing decisions—and therefore whether the alleged violation caused injury.  *See* Section IV-A(2).  Further, the manner in which other class members viewed the disclosures would also depend on their individual habits.  People can register for Spotify using their desktops, laptops, cell phones, tablets, or PlayStations. The size of the screen would affect among other things, the size of the disclosures, whether users had to scroll to view the entire page, and the resolution.

likelihood of future injury for injunctive relief addressing defendant's alleged APRL violation because he could not "reasonably argue that he stands to be fooled again in the future.")

Here, Ingalls lacks Article III standing to seek injunctive relief.  He testified he has no plans to purchase Spotify Premium now or in the future, Ingalls Depo. 154:2-14, and does not even use Spotify's free service. *Id.* 154:15-20.  To the extent he ever does re-subscribe to Spotify Premium, he is fully aware of the auto-renewal and cannot be deceived by any alleged omissions.

### 2.   Injunctive Relief Is Inappropriate Because Monetary Claims Predominate.

Ingalls also cannot seek injunctive relief because monetary claims predominate.  Rule 23(b)(2) certification is appropriate only where the **primary** relief sought is declaratory or injunctive.  *Zinser*, 253 F.3d at 1195.  A class seeking monetary damages may be certified pursuant to Rule 23(b)(2) where such relief is "merely incidental to [the] primary claim for injunctive relief."  *Id.* (citing *Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 780 (9th Cir. 1986)).  "Whether the monetary relief is understood as legal damages or an equitable remedy is irrelevant to this analysis."  *Ries*, 287 F.R.D. at 541 (citing *Dukes*).

Monetary claims predominate here.  FAC ¶ 74 (alleging class is "entitled to restitution . . . for all monies paid by Class Members under the subscription . . . . Defendant should be required to disgorge all the profits and gains it has reaped and restore such profits and gains to Plaintiff and Class Members[.]"); Mtn. at 16 ("Plaintiff seeks … restitution of $9.99 for the Class . . .  and $0.33/day the remainder of the month following the date of cancellation for members of the Sub-Class."); FAC ¶¶ 7, 48g, 74.[13]  Accordingly, a Rule 23(b)(2) class is improper.

### V.   CONCLUSION

For these reasons, Spotify requests the Court deny certification of the proposed class and subclass.

---

[13] Ingalls vaguely suggests an "order requiring Spotify to bring its AROT disclosures into compliance with the APRL and enjoining Spotify from resuming its unlawful practices."  Mtn. at 25.  This "essentially amounts to a request for an order directing [defendant] to comply generally with existing [law]—an obligation that would exist even in the absence of an injunction," *Murray*, 2014 U.S. Dist. LEXIS 18082, *34, and is an improper basis for relief.  Nor has Ingalls shown how the proposed injunction would address his alleged injuries, as he has not been exposed to Spotify's **current** disclosures—he purchased Premium four years ago—and won't be again.

25

DATED: June 8, 2017                                    Respectfully submitted,

                                                       DAVIS WRIGHT TREMAINE LLP
                                                       Joseph E. Addiego, III
                                                       Stephen M. Rummage
                                                       Scott R. Commerson

                                                       By:   /s/ Joseph E. Addiego, III
                                                              Joseph E. Addiego, III
                                                       Attorneys for Defendant
                                                       SPOTIFY USA, INC.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 3:16-cv-3533 WHA
4851-7906-5674v.8 0098755-000014