UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

GREGORY INGALLS and TONY HONG, )
individually and on behalf of )
all others similarly situated, )
                         )
         Plaintiffs, )
                         )
   VS.                   )    **No. C 16-3533 WHA**
                         )
SPOTIFY USA, INC., a Delaware )
corporation; and DOES 1 – 10, )
inclusive,              )
                         )
         Defendants. )
_____ )   San Francisco, California
                                 Thursday, July 13, 2017

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

For Plaintiffs:       LeonardMeyer LLP
                         5900 Wilshire Boulevard, Suite 500
                         Los Angeles, California 90036
             **By: Derek J. Meyer, Esquire**

                         Milstein Jackson Fairchild & Wade, LLP
                         10250 Constellation Blvd., Suite 1400
                         Los Angeles, California 90067
             **By: Sara D. Avila, Esquire**
                 **Marc A. Castaneda, Esquire**

For Defendants:      Davis Wright Tremaine LLP
                         505 Montgomery Street, Suite 800
                         San Francisco, California 94111
             **By: Joseph E. Addiego III, Esquire**

(Appearances continued on next page)

Reported By:    Katherine Powell Sullivan, CSR #5812, RPR, CRR
                     Official Reporter - U.S. District Court

**APPEARANCES (CONTINUED):**

For Defendants:          Davis Wright Tremaine LLP
                         1201 Third Avenue, Suite 2200
                         Seattle, WA  98101-3045
                   **By:  Stephen M. Rummage, Esquire**

                         Davis Wright Tremaine LLP
                         865 South Figueroa Street, Suite 2400
                         Los Angeles, California  90017-2566
                   **By:  Scott R. Commerson, Esquire**

<u>**Thursday - July 13, 2017**</u>                    <u>**8:11 a.m.**</u>

P R O C E E D I N G S

---oOo---

**THE COURT:**  Gregory Ingalls versus Spotify, 3533.

**THE CLERK:**  Thank you, Your Honor.

Counsel, please come forward and state your appearances for the record.

**MR. MEYER:**  Derek Meyer on behalf of plaintiffs.

**MR. RUMMAGE:**  Good morning, Your Honor -- sorry.

**MS. WADE:**  Good morning, Your Honor.  Gillian Wade on behalf of plaintiffs.

**MS. AVILA:**  Good morning, Your Honor.  Sara Avila also on behalf of plaintiffs.

**MR. CASTANEDA:**  Good morning, Your Honor.  Marc Castaneda, counsel for plaintiffs.

**MR. RUMMAGE:**  Good morning, Your Honor.  Steve Rummage on behalf of Spotify.

**MR. ADDIEGO:**  And Joe Addiego on behalf of Spotify.

**MR. COMMERSON:**  Scott Commerson on behalf of Spotify.

**THE COURT:**  Thank you.  You're on a couple of motions.

I have a question.

Everyone be seated except for the two lawyers.

I want to know this.  And, by the way, we're not going to put anything under seal.  This is so -- this is a public court.  We are not a wholly owned subsidiary of Spotify.

And that information about how many people signed up for this service is public. It's going to be public. It will not be under seal.

If you want to take an emergency writ to some court, fine, I'll keep it under seal pending that; but, otherwise, no.

**MR. RUMMAGE:** Understood, Your Honor.

**THE COURT:** All right. Now, I want to know the answer to this. How many people signed up, got charged, did not cancel -- signed up then they got charged, but never used the service again?

I want to know the answer to that.

**MR. RUMMAGE:** Short answer is we don't know, Your Honor.

**THE COURT:** All right. We're going to find out.

How come you -- who's going to talk? I want to know on the plaintiffs' side, why didn't you get me the answer to that question?

**MR. MEYER:** We weren't aware of what they knew on that issue.

**THE COURT:** Well, why didn't you get that in discovery?

That is your best argument for a class, is that group.

And I want to know the answer to that question. How many are in that group?

**MR. MEYER:** We'll find out.

1    **THE COURT:** No, it's a little late to find out now.

2    I bet you do know the answer.

3    **MR. RUMMAGE:** Actually, the answer --

4    **THE COURT:** You do know the answer to that.

5    **MR. RUMMAGE:** We're actually not a hundred percent

6    sure we can find out.

7    Your Honor asked us to discuss what we could find.  And

8    I'm happy to go through the steps of why I say that.

9    **THE COURT:** Well, maybe we should have some discovery,

10   or an evidentiary hearing, and bring those people in from

11   your -- I've seen and heard this story many times.  And when I

12   get them on the stand, they actually do know the answer.

13   All right.  Okay.  Let's go to the -- forget about class

14   certification for now.  Let's go to the summary judgment

15   motion.  Give me your single best point.

16   **MR. RUMMAGE:** Well, I think the single best point

17   is -- one point for Mr. Hong and Mr. Ingalls.

18   Mr. Hong --

19   **THE COURT:** He's out of the case, isn't he?

20   **MR. RUMMAGE:** Has conceded the motion.

21   **THE COURT:** He's gone.

22   **MR. RUMMAGE:** Exactly.

23   **THE COURT:** Forget him.

24   **MR. RUMMAGE:** The single best point for Mr. Ingalls is

25   that there is absolutely nothing on this record from which Your

Honor could infer, from which a fact finder could infer, that
the alleged violation of the APRL law caused Mr. Ingalls'
injury whatsoever.  And the reason we say that is because this
is a case where all the information that's required by the APRL
is there.

Their allegation is that, you know, he didn't --

THE COURT:  If it's there, then how come there's any
violation?

I don't think it's there.  I think there were violations.
I don't see how you can say that the statute wasn't violated.

MR. RUMMAGE:  Well, with due respect, Your Honor, I
wish we would have an opportunity to brief that to the Court as
to why we believe there's no violation.

THE COURT:  Why didn't you make a motion for summary
judgment on that ground?

MR. RUMMAGE:  Because we thought that the simplest
motion, after hearing Mr. Ingalls' testimony, was that
Mr. Ingalls' did not suffer injury as a result of the alleged
violation.

The reason we say that --

THE COURT:  The reason is what?

MR. RUMMAGE:  The reason is he didn't bother to read
any of these provisions.

THE COURT:  Well, maybe if it had been more prominent,
he would have read it.

**MR. RUMMAGE:** And he didn't say, "If it had been more prominent, I would have read it." He did not say that.

**THE COURT:** What did he say?

**MR. RUMMAGE:** What he did say was -- I'll quote it because it's tepid, shall we say.

**THE COURT:** Read the question and the answer. I want to hear the question.

Did you ask, "If it had been more prominent, would you have read it?" No, you didn't ask that.

**MR. RUMMAGE:** No. Nor did he put in a declaration saying, "If it had been more prominent, I would have read it."

Because at this point, as Your Honor knows better than I, his burden under *Anderson vs. Liberty Lobby* is to come forward with evidence that would support a judgment in his favor on the applicable burden of proof.

**THE COURT:** It may be just the circumstances are enough that a reasonable person, if it had been more prominent, would have read it.

**MR. RUMMAGE:** With due respect, Your Honor, I disagree with that.

And the reason I say that is that when Mr. Ingalls testified, first of all, he said, and I quote, Because it wasn't -- because the button, the confirm button was more prominent -- and somebody is digging out the actual deposition testimony here -- he said, "I may have skimmed past it." That

was his testimony.  "I may have skimmed past it."  He didn't

even say definitively, "I didn't read it."  He said, "I may

have skimmed past it."

     And then he never says that, "If I hadn't skimmed past it,

and if I read it, I wouldn't have done what I did."

     Why didn't he say that?  Because he couldn't even say with

certainty that he did skim past it.

          **THE COURT:**  I would like to hear -- you know, people

come to me all the time.  For about three years I fell for it.

And that is, they say, "He never said in the deposition X."

Well, maybe that's important.  That sounds good until you find

out they never asked the right question and he didn't have to

say that.

          **MR. RUMMAGE:**  The problem is when we move for summary

judgment, if the right question wasn't answered to elicit that

answer in the deposition, his duty, his obligation under

settled law is to come forward and provide that answer in a

declaration.  And that's not there.

     There is nothing from which Your Honor could conclude --

          **THE COURT:**  All right.  Have you got the deposition

there?

     All right.  Somebody is bringing it forward.

     Read me the question then the answer.  If there are

objections in there, give me the objections.

          **MR. RUMMAGE:**  Page 120 of his deposition, it says:

1          "Just to be clear, because I'm rereading my question,

2      it's your belief that you did not read the automatic

3      renewal language above the confirm payment button on

4      Exhibit 36 when you were completing your transaction; is

5      that correct?"

6      The interjection is interposed:

7          "Vague and ambiguous."

8      We'll leave that aside for the moment.

9      And the witness responds, quote:

10          "I'm not sure.  The confirm payment is -- it calls a

11      lot more attention to itself in color and in size than the

12      yellow box, the text which has the disclosure.  So I may

13      have skimmed past it."

14      That's the question.  That's the answer.

15          **THE COURT:**  Okay.  So where is the part that -- where

16  he says, "If you had complied with the law, I would not have

17  read it anyway"?

18              **MR. RUMMAGE:**  It's not there.

19              **THE COURT:**  Well, then, that's your problem.

20              **MR. RUMMAGE:**  That's his job.

21      No.  With due respect, Your Honor, at this point, once we

22  come forward and show --

23              **THE COURT:**  You said it was in the deposition.

24              **MR. RUMMAGE:**  Pardon?

25              **THE COURT:**  That was untrue.  You said he had admitted

the case away in the deposition.

And the question you read to me is just a trick. You -- you misled me. You said in the deposition that he had said, in effect, that if you had complied with the law he wouldn't have read it anyway.

**MR. RUMMAGE:** I'm sorry. I obviously don't want Your Honor to believe I misled you. I will say that I did not say that. If Your Honor read me to say that, I apologize.

**THE COURT:** That's what I read you to say.

**MR. RUMMAGE:** I apologize.

**THE COURT:** That's, to me, the important question.

Of course, the way you concealed it, the screen thing and all that, was so hard to follow of course it's reasonable for him not to have read it. If you had complied with the law, like you should have, like the California legislature wanted you to, then maybe he would have read it. That's the whole point of the statute.

**MR. RUMMAGE:** Because, actually, when it was presented to him whether he could read it and whether it was easy to read and he said it was. And he said that it was understandable.

For example, the language is read to him.

"You see that language? Does this language explain to you that once the 30 day free trial ended you would be charged 9.99 fee automatically to your credit card until you cancelled?

1       "Objection, vague and ambiguous."

2    Then after that he says:

3       "That it does."

4    That it does explain.  And then it's --

5       **THE COURT:**  If you don't comply with the law, so what?

6       **MR. RUMMAGE:**  Well, the reason is, Your Honor, this is

7  not a case where there are statutory damages.

8    For example, the legislature could have made this like the

9  Federal Truth in Lending Act and said, if you don't comply with

10  the law, you owe a thousand bucks.  Period.  End of story.

11    It didn't do that.  What it said was the same remedies

12  that are available for other violations of the fair advertising

13  law -- obviously the UCL as well -- are remedies that are

14  available.

15    And both of those civil remedy provisions require that

16  somebody show injury caused by the statutory violation.  So

17  that's his obligation under the law.

18       **THE COURT:**  Hold that.

19    The other side is accusing you, on the plaintiffs' side,

20  of failing to put in enough to get by the *Liberty Lobby* case.

21    So what did your own guy say in his declaration for this

22  case that gets close to saying that, "If they had complied with

23  the law, I would have read it"?

24       **MR. MEYER:**  He said -- his testimony that he wanted to

25  try the product for free and that -- that he did not know he

1    was going to go charged --

2        **THE COURT:**  Why did he give the credit card, for

3    goodness' sakes?

4        You know -- look.  Your guy is a sophisticated guy.  He

5    gives them the credit card for the free trial period; right?

6    It's true.

7        **MR. MEYER:**  Correct.

8        **THE COURT:**  Say "yes."

9        **MR. MEYER:**  Yes.

10       **THE COURT:**  All right.  Now, isn't it logical that

11   he's giving that credit card number for some purpose; right?

12       **MR. MEYER:**  Which could be the purpose that -- his

13   understanding, which he testified to, that he thought he was

14   going to be notified when the trial was over and be given an

15   option to pay, and that would have facilitated that in the

16   future.

17       **THE COURT:**  That -- that he might in the future --

18       **MR. MEYER:**  His testimony --

19       **THE COURT:**  Does that make sense to you that somebody

20   would hand over their credit card and not at least think that

21   there's a risk that, "At the end of the free period they're

22   going to start charging me"?

23       **MR. MEYER:**  Well, when your belief is that you're

24   going to be notified and given an option to pay, that's his

25   testimony.

1    **THE COURT:** Read that part to me. Read where he

2 actually says that.

3    **MR. MEYER:** Okay.

4    **MS. AVILA:** Your Honor, may I address the Court on

5 this issue?

6    **THE COURT:** I wish you would if you know the record.

7   Do you know the record?

8    **MS. AVILA:** Yes, Your Honor.

9    **THE COURT:** Why don't you have your boss there have a

10 seat. And give me your name again.

11    **MS. AVILA:** Thank you, Your Honor. Mr. Ingalls --

12    **THE COURT:** What's your name?

13    **MS. AVILA:** Sara Avila.

14    **THE COURT:** Do you know the record here?

15    **MS. AVILA:** Yes, I do, Your Honor.

16    **THE COURT:** I bet you do.

17   I want you to explain to me what happened here.

18    **MS. AVILA:** At the deposition, Mr. Ingalls was asked

19 why he believed Spotify asked for his credit card when signing

20 up for the free trial.

21   And Mr. Ingalls testified that he believed -- he didn't

22 know, but he did --

23    **THE COURT:** Can you read to me what he actually said

24 instead of giving me spin?

25    **MS. AVILA:** Yes. I have the deposition testimony

1  memorized, but not the page number.  My apologies, Your Honor.

2          **THE COURT:**  I'm going to give you some time to find

3  it.

4          **MS. AVILA:**  Page 122.

5          **THE COURT:**  All right.  So say "question," read the

6  question, then read the answer.  Say "answer," then read the

7  answer.

8          **MS. AVILA:**  Okay.  So, actually, at page 121, line 23:

9          "So on Exhibit 36, when you input your credit card" --

10         **THE COURT:**  You're reading too fast.  Read half that

11  fast.

12         **MS. AVILA:**  (Reading)

13         "On Exhibit 36, when you input your credit card

14     information, do you have an understanding for what purpose

15     you're providing the credit card information?

16         "I understand you didn't read the text above the

17     confirm payment button, but what was your understanding of

18     why you were being asked to provide credit card

19     information to Spotify?"

20     There was an objection.

21     And the answer:

22         "I thought it was for proof of identity.

23     **"Q.**  So you believed that Spotify was just trying to

24     confirm your identity by asking for credit card

25     information?

1       **"A.** That and, yeah, possibly to make it easier if I did

2       opt to subscribe into the service.

3       **"Q.** With respect to the proof of identity, can you

4       explain to me why Spotify would want to get proof of your

5       identity other than to be able to charge you for the

6       service?

7       **"A.** Proof of my age, make sure I'm a certain age to be

8       able to listen to music with, like, swear words. I don't

9       know."

10          **THE COURT:** All right. Now, let me ask -- hold that

11      very spot.

12          In my opinion, I might not believe that if I was on a

13      jury. But a jury could reasonably believe what I just read --

14      what she just read to me.

15          **MR. RUMMAGE:** That may be, Your Honor.

16          Two things. First of all, that's not the only testimony

17      on the point. There was something I did want to give Your

18      Honor without spin, and I couldn't find it while I was talking.

19      But let me read this now because he's then presented, in a

20      separate part of his deposition, page 118 lines 14 through 21:

21          "Do you see that language above the confirm payment

22          button on Exhibit 36 is highlighted in yellow?"

23          That's the language that we're debating about.

24          "Yes."

25          "Do you have any problem reading the text on that

page?"  Exhibit 36.

Ms. Avila objects that that is vague and ambiguous.

The witness answers:

"No, I have no problem."

**THE COURT:**  So what?

**MR. RUMMAGE:**  So the point is that he saw -- he had the ability to see, if he chose, all the information that this was a recurrent subscription.

That's what that language says.  All the information that you can cancel before the expiration of your free trial period if you wish not to be charged, all the information about how to cancel, the information that there are no partial refunds, it's all right there.  He said, I had no problem reading it.  I had no problem understanding it.

So if he doesn't read it, Your Honor, he can't complain about it.

**THE COURT:**  He can --

**MR. RUMMAGE:**  That's the law.

**THE COURT:**  He can complain about it if you didn't comply with the law.

**MR. RUMMAGE:**  With due respect, Your Honor, that would be true if there were a statutory penalty associated with it.  But there's not.

So he has to show causation and damages.  And the case law is pretty clear that in an area like this, you don't read the

disclosure, you can't complain about its substance.

   **THE COURT:** Then your company could just blow the law off totally --

   **MR. RUMMAGE:** Absolutely not.

   **THE COURT:** -- and just say, we're going to do it our way, and we'll get as -- we'll --

   **MR. RUMMAGE:** Well, Your Honor --

   **THE COURT:** What's the purpose of the law, then, if we can't hold you to some kind of penalty for not complying?

   **MR. RUMMAGE:** There is a penalty for complying.

   **THE COURT:** What is it?

   **MR. RUMMAGE:** The law makes clear that the penalty may be enforced by the county attorney, by the attorney general.

  And I will say, by pure serendipity, Your Honor, two days ago I get from a client a copy of a letter from the district attorney of Napa County, inquiring into alleged violations of the APRL.  Different client entirely.

  They are out there enforcing this.  They get penalties. That's what the legislature chose.

  But for civil remedies, you have to go the UCL and FLA. And if you want to recover damages, you've got to show causation and injury.

  Maybe it's hard.  Maybe it's hard, Your Honor, but if the legislature wanted to make it so that everybody recovers something when there is a modest technical violation of the

1    law, simple solution.  Congress has done it over and over

2    again.  Your Honor sees these class actions all the time with

3    statutory penalties.

4        But that's not under the APRL.  There are no statutory

5    penalties recoverable in civil actions by private citizens.

6           **THE COURT:**  Ms. Avila?

7           **MS. AVILA:**  Yes, Avila.

8           **THE COURT:**  What do you say to the argument that he

9    wasn't damaged because he didn't read it, he doesn't seem to

10   read much of anything; and even if they had complied with the

11   law, he would have done it anyway, he would have signed up

12   anyway?  So what do you say to that?

13       In other words, for example -- I'm going to let you

14   answer, but I'm looking for something like, oh, didn't you

15   know, Judge, he put in a declaration where he said, If they had

16   complied with the law and if it had been in big letters, I

17   would definitely have read it?

18       Does he say anything like that?

19         **MS. AVILA:**  Your Honor, I would like -- may I address

20   one point that he made and then answer your question?

21         **THE COURT:**  Can you answer my question, and then you

22   can address whatever you want.

23         **MS. AVILA:**  Okay.  Mr. Ingalls was damaged as --

24   because he -- he signed up for a free trial, and he was charged

25   $30 for signing up for a free trial.

**THE COURT:** How can that be?  I didn't even know that fact.  Is that in all these papers somewhere?

**MS. AVILA:** Your Honor, he signed up for a free trial of Spotify Premium.  It was a 30-day trial.

After the expiration of the trial, he was charged automatically 9.99 per month for three months.  When he checked his credit card statement, he then learned that he had been charged automatically, without his knowledge, and he cancelled his Spotify Premium.

So at the time he signed up for a free trial, he didn't know that he was purchasing Spotify Premium.

**THE COURT:** Well, but -- right.  That's what he says. Okay.  But if they had complied with the law, would he have signed up anyway, is what I'm trying to say?

**MS. AVILA:** No, Your Honor.  He would not have signed up.

**THE COURT:** Where does he say that under oath someplace?

**MS. AVILA:** There are a number of places where he says that he was signed up without his knowledge.  He says that he was a grad student at the time.  He was living on student loans.  He was using free Spotify at the time.  He would not have purchased had he known he was going to be charged.

**THE COURT:** Show me where he says that under oath. That's -- what you say is the lawyer giving me spin.  But does

1  he say that someplace under oath, that, "I would not have

2  signed up had they complied with the law"?

3      **MS. AVILA:**  That specific question was not asked.

4      **THE COURT:**  Okay.  Did he put in a declaration on this

5  motion?  Or are we just relying on the deposition?

6      **MS. AVILA:**  We're relying on the deposition.  There's

7  a number of testimony where he says that he did not want the

8  service and he would not have signed up, but not in those

9  words.

10      **THE COURT:**  What do you say to the other point that

11  counsel made, that there's no statutory damage number thing

12  that the legislature came up with, so we have to fall back on

13  the 17200?  And since he's not going to be using this again in

14  the future, what do you say to that argument?

15      **MS. AVILA:**  Well, Your Honor, there is no testimony

16  that says he will not use this in the future.  The question

17  that was asked was whether he has a present intention to

18  purchase Spotify.  He said no.  He was then asked to confirm

19  that he will never purchase Spotify in the future.  He said no,

20  if the pricing options changed, he might.

21      **THE COURT:**  Read that part to me.

22      **MS. AVILA:**  Okay.  That's on page 154, line 2.

23      "**Q.**  Do you have any plans to purchase Spotify Premium in

24      the future?

25      "**A.**  No.

1    "Q.  You can be pretty certain that you're never going to

2    purchase Spotify Premium again; is that correct?"

3    Objection.

4    "A.  If it continues at the same price with the same

5    options, no."

6    He did not say that he would never purchase Spotify

7  Premium in the future.

8         THE COURT:  Well, was there more?  Is that the end of

9  the line of the questions?

10        MS. AVILA:  And then counsel asked again:

11        "And you have no present plans to purchase Spotify

12    Premium; is that correct?

13    "A.  Correct."

14        MR. RUMMAGE:  May I add something on that point, Your

15  Honor, that's important?

16        THE COURT:  What's that?

17        MR. RUMMAGE:  This case, remember, is not about the

18  disclosures associated with subscribing to Spotify Premium.

19  This case is about the disclosures associated with signing up

20  for an introductory free trial for Spotify Premium.

21    Why does that matter?  Because you can only do that once.

22  He's done it.

23        THE COURT:  What do you mean?

24        MR. RUMMAGE:  Because if you look at -- this is at

25  docket 82-9, page 6 of 36.  This is the 30 day free trial terms

1 and conditions that Mr. Ingalls signed up for.

2 You may only use this free trial offer once. Why?

3 Because we don't want people coming back and just doing a

4 sequence of free trials. You get one shot. He's done it.

5 So even if he did intend to subscribe to Spotify Premium,

6 which he does not as that testimony makes quite clear, he does

7 not have the ability to come back and try this free trial

8 offer, which is what this lawsuit's about.

9 So he has no standing to seek an injunction. That is

10 abundantly clear under both Your Honor's decisions, the *Lyons*

11 decision from the Supreme Court, and the decision last year by

12 the Ninth Circuit in *Luman*, all of which made clear that this

13 sort of testimony dooms a claim for injunctive relief.

14 **MS. AVILA:** Your Honor, may I respond?

15 Mr. Ingalls would purchase a Spotify streaming service in

16 the future if an injunction were to issue. The question was

17 not asked during the deposition.

18 In light of the Court's order on July 6th, asking the

19 question, I spoke to my client.

20 And in April -- he's a current Pandora 1 subscriber, which

21 is a 4.99 per month music streaming service. He learned that

22 Pandora came out with a Pandora Premium service which is also

23 9.99 per month, the same cost as Spotify Premium. This has

24 rekindled his interest in purchasing a -- in purchasing a

25 Premium service.

Spotify's recently made new functions available on the Spotify Premium service.  Spotify Premium offers functions that Pandora Premium does not offer.

And although Mr. Ingalls is understandably very leery about ever signing up with Spotify again, in light of his -- the conduct that's outlined in the first amended complaint, however, I think he would be comforted if there were an injunction issued that were he to sign up again he wouldn't -- he would give affirmative consent or Spotify would obtain his affirmative consent again before he would sign up -- before he would be charged.

And, in fact, the fact that he signed up for a free service four years ago and there are a number of new options, I don't know that it's true that he would not be able to sign up again.

**THE COURT:**  But -- all right.  Those are good points.  But what do you say to what I just heard, which is that the one time -- the 30 day free trial you can only sign up for that one time?

So he -- Mr. Ingalls has already gotten his one free time, so he's not ever going to be in this position again.

**MS. AVILA:**  Well, Your Honor, he also had a trial -- I believe it was a one-day trial, free trial.  So he did actually use the free trial twice.  One was a --

**THE COURT:**  He got a one-day free trial?

1        **MS. AVILA:**  He got a one-day free trial when he first

2   signed up for Spotify.

3        **THE COURT:**  How many different kinds of free trials

4   are there for Spotify.

5        **MS. AVILA:**  There are a number of different free

6   trials for Spotify.  But the class is limited to two different

7   types of free trials.  One is a three for X, which means you

8   can get three months for X amount of dollars.  And then there's

9   also the free trial.  But --

10       **THE COURT:**  Does Spotify comply with the law now, in

11  your view?  In other words, have they fixed up their -- so that

12  it's compliant now or not?

13       **MS. AVILA:**  My understanding, they have not.

14      The discovery that we reviewed, I believe, went up to

15  maybe 60 days ago, 60, 90 days ago.  But we -- we haven't

16  checked.

17       **THE COURT:**  Without admitting that you didn't comply

18  in the past, have you changed the thing so that it's more

19  compliant with the statute?

20       **MR. RUMMAGE:**  I don't know whether there have been any

21  changes in the last 60 to 90 days, Your Honor.

22      I would say -- that's why I was shocked when Your Honor

23  earlier said, in your view, that didn't comply with the law,

24  because I believe, we believe, they clearly do comply with the

25  law, and certainly do as of the last revision that I saw.

1       **THE COURT:**  You didn't bring a motion on that.

2       **MR. RUMMAGE:**  Could, Your Honor.  But, as I said, we

3   thought the easiest path was to rely on Mr. Ingalls' testimony

4   which we thought was quite clear.

5       And even Ms. Avila's supplement to the testimony, unsworn

6   as it is, a moment ago, I don't believe changes anything in

7   terms of Mr. Ingalls' standing to seek injunctive relief as far

8   as the 30-day and the 90-day motions.

9       **THE COURT:**  One thing that bothers me about Spotify's

10  position here is, I think there is no one who could bring a

11  claim that would satisfy all of the Spotify -- your legal

12  position.

13      In other words, you say you can't get an injunction

14  because you've already been burned.  Now, you must be smart

15  enough not to get burned twice, so you can't get an injunction

16  because you're never going to use it again.

17      And so describe the kind of a plaintiff that could sue

18  you.

19      **MR. RUMMAGE:**  I'm always leery of that question, Your

20  Honor, as I'm sure you were.

21      **THE COURT:**  You never want to answer it because the

22  reason is there is no one.

23      **MR. RUMMAGE:**  I have an answer.

24      **THE COURT:**  What is it?

25      **MR. RUMMAGE:**  I do have an answer.

There's two classes of people.  First of all, I'm going to reiterate, because it's right there in the statute, it's what the legislature prescribed.  That is that, the district attorney, the attorney general, and law enforcement agencies have the right to bring actions for penalties.  Okay.  So that's clear.  So that's number one.

Number two, I don't prejudge the facts of any case, but I believe that this case would be very different and my argument would be very different if there were no language on that payment page that said all the things that you need to say in the statute.  We can debate now whether the font size were right or whether the color was right.

But if it were a company with a recurring payment program that had absolutely no disclosure that it recurs until you're finished, it seems to me that in that scenario a private citizen could satisfy the FAL and the UCL causation and injury requirements.  But we'd have to look at the facts, Your Honor.

**THE COURT:**  But I'm saying -- all right.  So you're saying it would have to be a blank page, and then a private citizen could sue.

**MR. RUMMAGE:**  You know, Your Honor, we --

**THE COURT:**  That's a pretty extreme position.

**MR. RUMMAGE:**  No, Your Honor.  I am giving you what I think is an obvious position.

But we all know, because we've been toiling in these

fields for many years, that the factual nuances from case to case vary dramatically.

And this case is a case where, by the way, the witness was sworn in, he was given an opportunity to testify for seven hours, he was given an opportunity to be cross-examined, he was given an opportunity to put in a declaration. And he just didn't say, if that had been bigger font, or whatever, I wouldn't have done it.

I might add, by the way, Your Honor, because you alluded to this earlier, there's a part in his deposition which shows why he never said that. Because he is asked, at one point in his deposition -- I believe it's at page 118 again. And, unfortunately, I lost my place when I went to the page Ms. Avila was citing.

But at the same page where he's asked whether that language is easy to read -- unfortunately, I've lost it -- he's asked a question about other instances in which he subscribed.

There we go. Thank you.

He says:

"We went through the payment process in the deposition today for NetFlix and the various gym memberships you put in your credit card information. You hit confirm payment and you didn't bother reading the disclosures on the page.

"That's for other ones."

And he says:

"I think it depends on how the terms were presented."
And he's asked:

"But I'm just talking generally. With respect to
those auto-renewing services, can you tell me which ones
you actually read the terms for and which ones you didn't?

"No.

"It's possible that for other goods or services you
similarly did not bother to read the terms before you
signed up?"

Objection.

"It is possible."

And then he eventually says in that testimony that he
believes that with most of them he didn't read the terms
and conditions.

So this is a situation where we're not -- Your Honor is
focusing on is there any way to get at Spotify. We're focusing
on the testimony of the named plaintiff. And that's what gives
rise to the summary judgment motion, because there is an
absolute absence of proof on the critical elements of causation
and injury.

And that's why we believe Your Honor should dismiss the
claim under the UCL, the claim under the APRL. There is no
claim under the APRL. But we believe they both should be
dismissed for lack of standing.

**THE COURT:** Ms. Avila, you get the last word, and then

1  I'm going to the next case.

2      **MS. AVILA:**  Your Honor, the testimony that I believe

3  Mr. Rummage is referring to was talking about the terms and

4  conditions which are provided via a hyperlink.

5      Mr. Ingalls testified that he does not usually click on a

6  hyperlink to a 25-page terms and conditions.

7      **THE COURT:**  Thank you.

8      The other motion, the only information I needed was how

9  many people signed up then got charged and never used the

10  service at all.  I want the answer to that.

11      **MR. RUMMAGE:**  Well, Your Honor, the question that Your

12  Honor posed in the order was, can we find out.  And I'm

13  prepared to address that if Your Honor wants.

14      **THE COURT:**  I want you to find out.  Do whatever

15  you've got to do, and get me the answer by Wednesday of next

16  week.  So I want to know the answer to that.

17      **MR. RUMMAGE:**  I believe, Your Honor --

18      **THE COURT:**  If it's impossible to do, then submit a

19  declaration that explains that.  And then these people on the

20  other side may be allowed to go take depositions all day long

21  to find out if you're telling me the truth.  So --

22      **MR. RUMMAGE:**  We will tell the truth, Your Honor.

23      **THE COURT:**  I believe the computer can tell us that

24  answer.

25      **MR. MEYER:**  Your Honor, may we make -- were you

asking -- we had one important point to make today, and we
never got our chance.

    **THE COURT:**  You already made a lot of points.

    **MR. MEYER:**  In response to questions, we would like to
make one point.

    **THE COURT:**  All right.  You have one point.

    **MR. MEYER:**  Thank you, Your Honor.

    **THE COURT:**  What is the point?

    **MR. MEYER:**  Spotify's entire position is based on this
premise that we have to prove fraud and reliance.  And if you
look -- it permeates their brief.

    If you look at 17602, what it says is, "It shall be
unlawful for a business to do any of the following."

    Spotify did not do the following.  It committed unlawful
acts.  And it's trying to read into here in -- through all its
briefing, this sounds in deception.

    No.  What it says is there's a statutory requirement for
what you have to put on your web page.  They didn't do it.  And
now they're coming back and saying even though we have an
unlawful web page, we're -- we have a get-out-of-jail-free card
because we have language in there that doesn't satisfy the
statute.

    And when you asked him what kind of plaintiff could
actually sue, he didn't identify a plaintiff.  He talked about
a fake defendant that doesn't exist.  And that's the problem I

1    have.  And we cited those insurance code cases where it says

2    even though it might be --

3          **THE COURT:**  You're making about five points.

4       (Laughter)

5          **MR. MEYER:**  Thank you.

6          **THE COURT:**  That's all.  Under submission.  Everything

7    is under submission.

8          **MR. MEYER:**  We appreciate your time.

9          **MR. RUMMAGE:**  Thank you, Your Honor.

10         **MS. AVILA:**  Thank you, Your Honor.

11      (At 8:45 a.m. the proceedings were adjourned.)

12                        -  -  -  -

13               **CERTIFICATE OF REPORTER**

14          I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above-entitled matter.

16    DATE:   Monday, July 24, 2017

17

18                    *Katherine Sullivan*

19    _____

20        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                     U.S. Court Reporter

21

22

23

24

25